STATE of Wisconsin, Plaintiff-Appellant,

v.

James R. THIEL, Defendant-Respondent-Petitioner.

Supreme Court

*No. 01–1589–CR. Oral argument April 30, 2003.—Decided July 15, 2003.*

2003 WI 111

(Also reported in 665 N.W.2d 305.)

574

For the defendant-respondent-petitioner there were briefs by *Bruce J. Rosen, Susan C. Blesener,* and *Pellino, Rosen, Mowris & Kirkhuff, S.C.,* Madison, and oral argument by *Bruce J. Rosen.*

For the plaintiff-appellant the cause was argued by *Daniel J. O'Brien,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals[1] that reversed a decision of the Circuit Court for La Crosse County, Dale T. Pasell, Judge.

¶ 2. The defendant, Dr. James R. Thiel (Thiel), was convicted of seven counts of sexual exploitation by a therapist in violation of Wis. Stat. § 940.22(2).[2] Following his conviction, Thiel claimed that his trial counsel was constitutionally inadequate. After a two-day *Machner* hearing,[3] Judge Pasell concluded that Thiel's counsel's performance did not meet constitutional standards and that Thiel was entitled to a new trial.

¶ 3. The State appealed. The court of appeals found that while Thiel's counsel may have been deficient in a few instances, any deficient performance was

---

[1] *State v. Thiel,* No. 01–1589, unpublished slip op. (Wis. Ct. App. Oct. 3, 2002).

[2] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

[3] Under *State v. Machner,* 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979), a hearing may be held when a criminal defendant's trial counsel is challenged for allegedly providing ineffective assistance. At the hearing, trial counsel testifies as to his or her reasoning on challenged action or inaction.

not prejudicial to Thiel's defense, and the court reversed the circuit court's decision. *State v. Thiel*, No. 01–1589–CR, unpublished slip op., ¶¶ 25–26, 28, 33–34 (Wis. Ct. App. Oct. 3, 2002). Judge Charles Dykman dissented, writing: "Was this a fair trial? When a trial judge answers that question "no," and there are facts and evidence to support that answer, appellate courts should only in a rare case reverse that answer." *Id.*, ¶ 41 (Dykman, J., dissenting).

¶ 4. This is a unique, subtle, and difficult case in which the credibility of the complaining witness was central to the jury's verdict. Thiel's trial counsel often performed effectively. However, he failed to use a great deal of available evidence to impeach the State's chief witness because of inadequate trial preparation. We conclude that counsel's performance was deficient in several respects and that the cumulative effect of the deficiencies prejudiced Thiel's defense to an extent that it undermines our confidence in the outcome of the trial. Because we find that Thiel received constitutionally inadequate representation, we reverse the decision of the court of appeals and remand the matter to the circuit court for a new trial.

I

¶ 5. The relevant facts are as follows. On August 19, 1999, JoAnn P. (JoAnn) reported to the City of La Crosse Police Department that she had engaged in sexual relations with her psychiatrist, Dr. James Thiel. JoAnn told Lieutenant Michael Brohmer (Lt. Brohmer) that she had seen Thiel professionally from August 1994 through July 1999, with a break between 1995 and 1997. She told Lt. Brohmer that the relationship became sexual in May 1997 and continued until she ended it in February 1999. JoAnn asserted that the sexual

contact took place not only during her office appointments but also at Thiel's home in La Crosse. According to JoAnn, she and Thiel met regularly—as often as three or four times a week.

¶ 6. JoAnn alleged that she disclosed the full nature of her relationship to a friend in the spring of 1999. The friend, Brian Ekern (Ekern), an assistant district attorney for Vernon County, testified that he counseled JoAnn to discontinue the sexual relationship and informed JoAnn that Thiel was committing a crime by engaging in a sexual relationship with her. On the eve of Thiel's trial, it was disclosed that Ekern and JoAnn had been involved in their own sexual relationship.

¶ 7. Even after JoAnn discontinued her sexual relationship with Thiel, she continued to see him for therapy. JoAnn's last appointment with Thiel took place July 30, 1999. At that appointment, she asked for Thiel's assistance in filing for government disability benefits. When Thiel refused, JoAnn became angry and claimed that she had a sample of his semen. JoAnn brought a semen sample with her when she reported her complaint against Thiel to Lt. Brohmer a few weeks later. Initially, JoAnn resisted providing the sample for testing, but by the end of the meeting, which included the intervention of the district attorney's office, she acquiesced. Brohmer sent the sample to the state crime laboratory for DNA testing.

¶ 8. Based on JoAnn's report and the physical evidence she provided, Thiel was charged with two counts of sexual exploitation by a therapist contrary to Wis. Stat. § 940.22(2).[4] The police arrested Thiel and

---

[4] At the times relevant to this action, Wis. Stat. § 940.22(2) provided:

took a blood sample for comparison with the physical evidence provided by JoAnn. When the DNA test results came back, they showed that Thiel was not the source of the semen. At a December meeting with police and a La Crosse County deputy district attorney, JoAnn admitted that the sample was not Thiel's and that she had lied about the sample's origin. It is unclear whether JoAnn had advance warning of either the general subject matter of the meeting or the DNA test results. JoAnn explained that she had submitted false evidence because she hoped it would force Thiel to confess.

¶ 9. On September 1, 1999, Thiel waived his preliminary examination. On October 4, the State filed an eight-count information, alleging seven counts of sexual exploitation by a therapist and one count of intimidation of a victim. The information was filed before the state crime laboratory had completed work on the semen sample. The eighth count of the information was dismissed on November 17.

¶ 10. On December 15 the State filed a motion for a continuance based on the crime lab results that excluded the defendant. This delayed the scheduled date of trial from January 10, 2000, to March 1, 2000, with jury selection scheduled for February 28.

¶ 11. On January 13, 2000, Thiel retained Attorneys John Brinckman and Margarita Van Nuland who served as his counsel at trial. The two attorneys were

Any person who is or who holds himself or herself out to be a therapist and who intentionally has sexual contact with a patient or client during any ongoing therapist-patient or therapist-client relationship, regardless of whether it occurs during any treatment, consultation, interview or examination, is guilty of a Class C felony. Consent is not an issue in an action under this subsection.

retained 46 days before trial was scheduled to begin. In late February, the March 1 trial date was rescheduled. Judge Pasell later wrote:

> On February 24, 2000, four days before trial, the State filed and scheduled for hearing the same day another motion for continuance. It also filed a motion for the admission of "other acts" evidence. Those motions were served on Thiel on that day. Over Thiel's objection, the trial was continued again for an additional week to allow for a hearing on the "other acts" motion prior to jury selection. On March 3, 2000, the "other acts" motion was heard, and two of the five other acts sought to be admitted by the State were ruled admissible.

¶ 12. Thiel's first attorney, Roger LeGrand, had asked for an early trial on October 19, 1999. He opposed the continuance on December 15. Thiel's new attorney opposed the delay in the March 1 trial. Thiel was concerned that the State would locate some of his former patients who might corroborate JoAnn's account through "other acts" testimony, and so he insisted that the trial not be delayed. Thiel's trial attorneys abided by his wishes and did not seek a continuance of the trial, even though one attorney informed Thiel that he could use more time to prepare. Ultimately, after the *Machner* hearing, Judge Pasell found that "[t]his was a case where counsel went to trial before counsel was ready to try the case."

¶ 13. The trial began on March 14, 2000, and lasted three days. The prosecution presented JoAnn's testimony against Thiel, including her description of Thiel's unclothed appearance, her description of the inside of Thiel's house, and her description of Thiel's personal habits. The prosecution also presented Ekern, who corroborated that JoAnn confided in him about the relationship. There were two "other acts" witnesses.

The first, Thiel's ex-wife, who had once been his patient, testified that her sexual relationship with Thiel began before their professional relationship had ended, and she corroborated, in some respects, JoAnn's description of Thiel's unclothed physical appearance and his personal habits. The second witness, another of Thiel's former patients, also testified regarding sexual contact with Thiel during a therapy session. In addition, Dr. David Metzler, a psychiatrist who had seen JoAnn after she discontinued her treatment with Thiel, testified as an expert during the prosecution's rebuttal. He contended that a psychiatrist should document any contact with patients that occurs outside of an appointment. During Dr. Metzler's testimony, the court indicated that Dr. Metzler should confine his testimony to standards that physicians might employ, rather than his own personal practice. Thiel's trial counsel made one objection to a portion of Dr. Metzler's testimony, but did not move to strike any of it.

¶ 14. The defense presented witnesses who testified that it was implausible that Thiel was carrying on an extensive relationship with JoAnn. Thiel's former girlfriend testified about her frequent unannounced visits to Thiel's house and said that there was never any indication that Thiel could be spending significant amounts of time with another woman. A business manager and receptionist from Thiel's office testified that neither had observed any inappropriate or suspicious interaction between JoAnn and Thiel.

¶ 15. Thiel also testified, stating that at no time did he have any inappropriate relationship with JoAnn. The defense theory was that JoAnn's accusation was in retaliation for Thiel's refusal to assist her in obtaining disability benefits. Thiel further explained that the details JoAnn provided regarding the interior of his

house could have been gathered by JoAnn when she showed up at his residence three times unannounced or if she entered his house when he was not there. He testified that such entry was possible because he generally left his house unlocked.

¶ 16. After a jury found Thiel guilty of all seven counts of sexual exploitation by a therapist,[5] he retained new counsel and filed a motion for a new trial on the basis that his trial counsel was ineffective. He alleged numerous deficiencies, including that his counsel failed to file a motion under Wis. Stat. § 972.11(3) that may have permitted the introduction of some of JoAnn's medical history,[6] that trial counsel failed to adequately investigate the underlying case against Thiel, and that trial counsel performed inadequately during trial.

---

[5] Thiel was sentenced to concurrent four-year prison terms on three counts and to concurrent ten-year probation terms following his release from prison on the remaining counts.

[6] Wisconsin Stat. § 972.11(3) provides:

(3)(a) In a prosecution under s. 940.22 involving a therapist and a patient or client, evidence of the patient's or client's personal or medical history is not admissible except if:

1. The defendant requests a hearing prior to trial and makes an offer of proof of the relevancy of the evidence; and

2. The court finds that the evidence is relevant and that its probative value outweighs its prejudicial nature.

(b) The court shall limit the evidence admitted under par. (a) to relevant evidence which pertains to specific information or examples of conduct. The court's order shall specify the information or conduct that is admissible and no other evidence of the patient's or client's personal or medical history may be introduced.

(c) Violation of the terms of the order is grounds for a mistrial but does not prevent the retrial of the defendant.

¶ 17. The circuit court heard two days of testimony regarding the ineffective assistance of counsel claim. At the conclusion of this evidence, the circuit court issued a 24–page opinion concluding that Thiel was entitled to a new trial because his trial counsel's performance fell below constitutionally accepted standards. The court of appeals reversed. Thiel petitioned this court for review, which we granted.

## II

¶ 18. Criminal defendants are constitutionally guaranteed the right to counsel under both the United States Constitution and the Wisconsin Constitution. U.S. Const. amends. VI, XIV; Wis. Const. art. I, § 7.[7] The right to counsel includes the right to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984) (citing *McMann v. Richardson,* 397 U.S. 759, 771 n.14 (1970)); *State v. Trawitzki,* 2001 WI 77, ¶ 39, 244 Wis. 2d 523, 628 N.W.2d 801. In order to find that counsel rendered ineffective assistance, the defendant must show that trial counsel's representation was deficient. *Strickland,* 446 U.S. at 687. The defendant must also show that he or she was prejudiced by the deficient performance. *Id.*

¶ 19. Counsel's conduct is constitutionally deficient if it falls below an objective standard of reasonableness. *Id.* at 688. When evaluating counsel's perfor-

---

[7] The standard for determining whether counsel's assistance is effective under the Wisconsin Constitution is identical to that under the federal Constitution. *See State v. Sanchez,* 201 Wis. 2d 219, 235–36, 548 N.W.2d 69 (1996).

mance, courts are to be "highly deferential" and must avoid the "distorting effects of hindsight." *Id.* at 689. "Counsel need not be perfect, indeed not even very good, to be constitutionally adequate." *State v. Williquette,* 180 Wis. 2d 589, 605, 510 N.W.2d 708 (1993).

¶ 20. In order to demonstrate that counsel's deficient performance is constitutionally prejudicial, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. The focus of this inquiry is not on the outcome of the trial, but on "the reliability of the proceedings." *State v. Pitsch,* 124 Wis. 2d 628, 642, 369 N.W.2d 711 (1985).

¶ 21. A claim of ineffective assistance of counsel presents a mixed question of law and fact. *Trawitzki,* 244 Wis. 2d 523, ¶ 19. This court will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* Findings of fact include "the circumstances of the case and the counsel's conduct and strategy." *State v. Knight,* 168 Wis. 2d 509, 514 n.2, 484 N.W.2d 540 (1992). Whether counsel's performance satisfies the constitutional standard for ineffective assistance of counsel is a question of law, which we review de novo. *Id.*

¶ 22. Thiel asks this court to modify the foregoing standard of review and, as a matter of policy, announce a rule that appellate courts accord some degree of deference to a trial judge's assessment of counsel's deficient performance and the prejudicial effect of counsel's errors. He reasons that trial judges have a

unique vantage point on these issues, having heard all the evidence and observed the conduct and demeanor of the witnesses, counsel, and members of the jury—both at trial and at the postconviction hearing.

¶ 23. We decline this invitation. Since the *Strickland* decision, this court has consistently held that "[t]he ultimate determination of whether counsel's performance was deficient and prejudicial to the defense are questions of law which this court reviews independently." *State v. Johnson,* 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990) (citing *State v. Pitsch,* 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985)); *see also Trawitzki,* 244 Wis. 2d 523, ¶ 19. To the extent that a trial judge wishes to introduce into the record factual determinations that require consideration on appeal—such as assessments of credibility and demeanor—the judge should articulate these findings of fact in his or her decision. On review, appellate courts must be sensitive to these findings and not exclude them, either expressly or impliedly, from an analysis of deficiency and prejudice, unless they are clearly erroneous.

¶ 24. In our review of Thiel's claim of ineffective assistance of counsel, we grant deference only to the circuit court's findings of historical fact. We review de novo the legal questions of whether deficient performance has been established and whether it led to prejudice rising to a level undermining the reliability of the proceeding.[8]

---

[8] Thiel argues for the first time in his reply brief to this court that, as an alternative resolution to his appeal, this court may order a new trial in the interest of justice. *See State v. Hicks,* 202 Wis. 2d 150, 171–72, 549 N.W.2d 435 (1996). The

589

## III

¶ 25. After two days of testimony regarding the performance of Thiel's trial counsel, the circuit court found that counsel's actions were deficient in four primary areas. First, counsel did not adequately read and review the discovery materials that had been provided by the prosecution, and the overlooked materials contained potentially important information for Thiel's defense. Second, counsel did not conduct any significant independent investigation into the underlying facts of the case or the credibility of the prosecution's witnesses. Third, counsel failed to file a motion under Wis. Stat. § 972.11(3) that would have allowed the defense to offer evidence of the complaining witness's prior personal and medical history. Fourth, counsel did not move to strike the testimony of Dr. Metzler, a motion that the court would have granted because no offer of proof was made to demonstrate community standards for a psychiatrist's documentation practices. The court then concluded that these deficiencies unconstitutionally prejudiced Thiel.

¶ 26. Before reaching these conclusions, the circuit court made extensive findings of fact. First, Thiel's counsel had police reports and medical notes in his possession prior to trial but never read parts of this discovery and did not adequately review other documents. The court found that counsel did not read the

circuit court, at the end of its order granting Thiel a new trial, cited *Hicks* and may have suggested, according to Thiel, that the real controversy had not been fully tried or that justice had miscarried. We conclude that the issue of whether Thiel is entitled to a new trial under *Hicks* is not properly before this court and has not been fully briefed and argued by the opposing parties.

medical notes of Drs. Metzler and Stwertka. These medical reports included the following information:

1. The complainant discussed her complaint against Thiel with Dr. Metzler in a therapy session on August 31, 1999, and maintained her lie that she had obtained a sample of Thiel's semen 16 months earlier.

2. The complainant told Dr. Metzler that she was "enraged" that Thiel would not support her disability claim and threatened him with the semen evidence.

3. The complainant told Dr. Metzler that she had met with Thiel on August 22, 1999, three days after she had gone to the La Crosse police with her story.

4. The complainant told Dr. Stwertka on September 2, 1999, that she had been unemployed for a period of three to four years.

The counsel who failed to read these reports was the attorney assigned the responsibility of handling any cross-examination of Dr. Metzler.

¶ 27. The court indicated that counsel did not adequately review the police reports. The police reports included the following information:

1. The complainant told Lt. Brohmer that Thiel lived at 2002 Adams Street, although his actual address was 2006 Adams Street.

2. The complainant told Lt. Brohmer that she believed Thiel's house was the third house from the corner. In fact, it was the second house from the corner.

3. The complainant told the authorities that she had confided in her husband about her relationship with Thiel on June 11, 1999, the day her husband returned from Bosnia. However, the complainant's hus-

band reported to police that he did not learn about the relationship until July 16, 1999, following a meeting with Thiel.

4. Ekern told police in a taped interview on February 4, 2000, that he first learned from the complainant of the claims of assaults by Thiel "shortly before, I think she reported it." He went on to say, "You know, I guess I don't even know. Might (inaudible) a year ago." He also stated that the complainant had called him about this information at his office.

¶ 28. Second, counsel did not do any significant independent investigation in several areas. The court found that:

1. Counsel conducted only perfunctory interviews with Lt. Brohmer and Ekern.

2. Counsel made no effort to speak with the complainant.

3. Counsel made no effort to interview the husband of JoAnn, who was listed as a witness for the defense.

4. Counsel did not go either to Thiel's office or to his house where the acts purportedly occurred.

5. Counsel made no effort to interview neighbors to determine if they had seen the complainant or the complainant's vehicle at Thiel's house.

6. Counsel did not check the Consolidated Court Automation Programs (CCAP) or make any open records requests on the background of any persons who were to testify.

7. Counsel made no attempt "to independently show that the corroborations offered by the complainant did not pan out."

8. Counsel made no attempt to obtain telephone records between the complainant and Ekern.

9. Counsel did not discover that the complainant did not have a driver's license during the time that she reportedly drove more than 100 times to Thiel's house.

¶ 29. The circuit court found that "the facts set forth above were either provided to defense counsel in the form of discovery, or were readily available through an appropriate investigation." The court set out in its opinion how each piece of information would have helped impeach the complaining witness by showing the motivation for her complaint, her lies before trial, her inconsistent statements before and at trial, the lack of corroboration of her story, the inconsistency in testimony of other witnesses, and the possible inadmissibility of the testimony of Brian Ekern.

¶ 30. Third, counsel did not file a motion under Wis. Stat. § 972.11(3) that, if granted, would have allowed the defense to present evidence of the complainant's prior personal and medical history. The court added that all statements made to Dr. Metzler and another doctor concerning JoAnn's allegations against Thiel would have been admitted, given that they were highly probative of the complainant's truthfulness and not prejudicial because they would not have gone to her medical condition. Counsel not only failed to file this motion but also misinterpreted the statute to mean that if the defense did not file the motion, then *neither* party could introduce evidence of the complainant's personal or medical history.

¶ 31. Fourth, counsel failed to strike the testimony of Dr. David Metzler even though the evidence,

according to the circuit court, "was inadmissible, and would properly have been stricken if such a motion had been made."

¶ 32. Based on our review of the record, none of these findings of fact is clearly erroneous. Therefore, we accept these findings as true and apply them to the legal standards articulated under *Strickland. See State v. Smith,* 207 Wis. 2d 258, 266, 558 N.W.2d 379 (1997) (citing *Pitsch,* 124 Wis. 2d at 633–34; Wis. Stat. § 805.17(2)).

## IV

¶ 33. We turn now to whether Thiel's counsel's performance was deficient based upon the factual findings of the circuit court. We find that several aspects of counsel's performance fell below objective standards of reasonableness and were deficient as a matter of law.

¶ 34. Three considerations are worth noting at the outset. First, the critical evidence against Thiel was the complainant's testimony. There was no physical evidence and no witness to the alleged acts. The testimony of Brian Ekern involved prior consistent statements of the complainant supporting her story. "Other acts" testimony lent credibility to the complainant's accusations. With this in mind, JoAnn's credibility was the essential consideration for the jury, and it was strengthened by Ekern's testimony.

¶ 35. Second, we acknowledge the circuit court's factual finding that Thiel objected to any continuance despite the fact that counsel advised Thiel that he could use more time. From the beginning of the prosecution, Thiel urged his attorneys to try the case quickly. Counsel had approximately 60 days to prepare for trial. The defendant's demand for a speedy trial did not absolve counsel of the responsibility to be prepared for trial.

¶ 36. Third, Thiel had three attorneys. Only one was spotlighted at the *Machner* hearing. We acknowledge that the narrow focus of the post-trial record may give a distorted perception of the whole proceeding.

¶ 37. Turning to counsel's performance, we first recognize that counsel's failure to review certain portions of the discovery provided by the prosecution—especially Dr. Metzler's medical reports—was deficient performance as a matter of law. In a felony case where the client potentially faces significant prison time, it falls below objective standards of reasonableness to fail to read all portions of discovery that may have the potential to educe information that is either beneficial or damaging to the client's cause.

¶ 38. We can perceive no strategic or tactical advantage for a criminal defense attorney not to read discovery provided by the prosecution that may yield exculpatory evidence. The discovery documents in this case could have contained, and did contain, information that would have benefited Thiel's defense. Unread discovery not only provided critical information directly but also provided insight into other facets of the case that deserved more thorough investigation.

¶ 39. Second, as noted, we accept as true the circuit court's findings that counsel failed to independently investigate certain lines of inquiry. Trial counsel did not attempt to interview several of the prosecution's primary witnesses, did not investigate JoAnn or other witnesses on CCAP or through open records requests, did not discover that JoAnn did not have a driver's license even though she claimed to drive often to Thiel's house, conducted only "perfunctory" interviews with Lt. Brohmer and Ekern, did not obtain JoAnn's phone records, did not independently attempt to show that the

complainant's story did not "pan out" (such as interviewing Thiel's neighbors to see if they had ever seen JoAnn at Thiel's house), and did not himself visit the office or house where the events in question allegedly took place.

¶ 40.　Whether trial counsel's failure to investigate these matters is deficient performance requires careful analysis. Some of counsel's failures to investigate cannot easily be separated from the failure to read the discovery. Under *Strickland,* "counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary." Strickland,* 466 U.S. at 691 (emphasis added). For example, defense counsel cannot claim to have decided strategically to forgo interviewing a particular witness if counsel has not read the police report relating to that witness, because that would not be an informed decision. Therefore, if we find that counsel's decision not to fully investigate was the result of not reading discovery, then the decision not to investigate is itself deficient, because it was not reasonable.

¶ 41.　Most of counsel's failures to investigate cannot be attributed to a failure to master the discovery documents.[9] As we understand the record, the La Crosse police failed to disclose two pieces of information in discovery. First, on August 27, 1999, Lt. Brohmer had

---

[9] For example, at the *Machner* hearing, trial counsel testified that his decision not to attempt to interview JoAnn or her husband before trial was that it was his practice to cross-examine the complaining witness without having met the individual before. Given that trial counsel's usual mode of operation in this regard developed from experiences outside of this case, nothing in the discovery materials, indeed nothing intrinsic to this case, would have likely changed this reasoning.

the complainant's husband drive the complainant to Thiel's house in an effort to verify the address. The complainant had difficulty in locating Thiel's house. Second, Lt. Brohmer also interviewed one or more neighbors of Thiel to determine whether any neighbors recalled seeing the complainant at Thiel's house. None did. This information was notable because of complainant's claims that she visited Thiel's house more than 100 times.

¶ 42. After reporting this information in his decision, Judge Pasell wrote: "Neither the complainant's difficulty in locating the house, nor the lack of any recollection of the neighbors of seeing the complainant at Thiel's home are contained in reports that were available to the defense." He added: "This information might properly have been disclosed to the defense as exculpatory under the discovery demand that had been filed."

¶ 43. We agree with the court that this information should have been disclosed to the defense under Wis. Stat. § 971.23(1)(h) ("Any exculpatory evidence"). Had this information been disclosed, the complainant's misstatement of the number and location of Thiel's house might have appeared more significant. Counsel might have been more inclined to visit the house, interview the neighbors, and ask more probing questions of Lt. Brohmer during his "perfunctory" interview.

¶ 44. In any event, we cannot find that counsel's failure to investigate is derivative of a failure to read and absorb all the discovery documents.[10] Hence, we

---

[10] While it is evident that the transcript of Ekern's interview with police might spark curiosity about the timing of when

must determine whether these instances fell below an objective standard of reasonableness in a more general sense. In other words, was it unreasonable not to perform certain investigations in this case? In answering this question, it is important to remember that *Strickland* informs us that "counsel is strongly presumed to have rendered adequate assistance" and that we are to "apply[] a heavy measure of deference to counsel's judgment." *Strickland,* 466 U.S. at 690–91. Also, "a defendant who alleges a failure to investigate on the part of his or her counsel must allege with specificity what the investigation would have revealed." *State v. Leighton,* 2000 WI App 156, ¶ 38, 237 Wis. 2d 709, 616 N.W.2d 126. If we decide that the decision not to investigate is unreasonable, we must find that trial counsel's performance is deficient. *See Brown v. Sternes,* 304 F.3d 677, 692 (7th Cir. 2002); *Franklin v. Johnson,* 290 F.3d 1223, 1236 (9th Cir. 2002).

¶ 45. Thiel is asking us to look back on counsel's pretrial performance to find that there were specific things that counsel should have done to prepare for trial. This is a difficult assessment given that there is a broad spectrum of representation and preparation that will be deemed sufficient. However, under the facts of this case, counsel's lack of any significant independent investigation falls outside of this wide spectrum.

¶ 46. The credibility of the complaining witness was paramount to this case. In this situation, trial counsel was aware of the need to locate any evidence or information to impeach the complainant's testimony,

---

JoAnn revealed to Ekern the nature of her relationship with Thiel, trial counsel appears to have read this portion of the discovery.

regardless of what was found in the discovery. The case was a classic instance of the "he-said-she-said" dilemma. By the time that trial counsel became involved, JoAnn had already demonstrated a propensity for lying, and counsel's failure to delve further into the circumstances of the charges and the background of Thiel's accuser is objectively unreasonable. This investigation should have included inquiry into additional documents and persons that could either corroborate or dispel her allegations, especially Ekern, who was slated to offer a prior consistent statement of the complainant.

¶ 47. Thiel has pled with the required specificity what a more thorough investigation would have uncovered. *See Leighton*, 237 Wis. 2d 709, ¶ 39. For example, a simple background check would have revealed that JoAnn had no driver's license, even though she claimed to have driven to Thiel's house more than 100 times. Taking the time to visit Thiel's neighbors would likely have revealed to trial counsel that none of the neighbors recalled seeing JoAnn, even though her alleged visits occurred three or four times a week.

¶ 48. In addition, a more thorough interview with Ekern might have revealed that JoAnn first told Ekern about her sexual relationship with Thiel only a short time before she reported it to the police. This might have prevented Ekern from testifying to JoAnn's prior consistent statement or made it easier to expose some inconsistencies in his trial testimony.

¶ 49. The police report indicated that JoAnn informed Ekern about the alleged sexual relationship in a telephone call to Ekern's office. Counsel did not take any cue from this reference to a critical telephone call. Thiel's postconviction counsel produced telephone records revealing that approximately 44 telephone calls were placed from the complainant's phone to Ekern,

either at his office or at his residence, between July 26, 1999, and January 31, 2000. These phone records, showing calls at critical points in the proceedings, put a different light on the relationship between JoAnn and Ekern and were probably inconsistent with Ekern's trial testimony.

¶ 50. The failure to undertake any independent investigation was deficient. It shows how counsel lacked initiative to develop Thiel's case and instead assumed a more reactive role to the development of evidence related to the competing accounts of JoAnn's relationship with Thiel. Under the specific facts of this case, we conclude that it was objectively unreasonable for Thiel's counsel not to pursue further evidence to impeach JoAnn in the aftermath of her lie regarding the semen evidence and to contradict her version of events.

¶ 51. Third, counsel's interpretation of Wis. Stat. § 972.11(3) reflects a failure either to research or correctly interpret relevant portions of the law. The circuit court found that counsel interpreted this statute as allowing the defense to prevent the State from presenting evidence of the complaining witness's prior personal or medical history if the defense did not file a motion under § 972.11(3). This is an unreasonable view of this statute, as the statute does not preclude the state from offering relevant and not overly prejudicial evidence. Although counsel claimed that the failure to file the motion was for strategic reasons, the strategy was based on an erroneous view of the law and ultimately barred Thiel from presenting information contained in JoAnn's medical records. By contrast, counsel's lapse did not hinder the prosecution's ability to present JoAnn's personal or medical records. Thus, counsel's

failure to understand the statute and his concomitant failure to file a motion under its provisions were deficient as a matter of law.

¶ 52. Finally, the circuit court noted trial counsel's failure to move to strike the testimony of Dr. Metzler. The court noted that it would have granted such a motion had one been made.

¶ 53. The court's conclusion needs to be put in context. During the presentation of Thiel's defense, Thiel testified that the complainant had come to his house three times uninvited. Thiel was unable to show that he made any record of these visits in his patient records. On rebuttal, the State called Dr. Metzler, who testified that a psychiatrist should document any contact with a patient that occurs outside the office:

> [Prosecutor]: If you were provided—excuse me. If one of your patients called you at your home, would you document that in the patients (sic) chart?

> [Dr. Metzler]: Yes.

> [Prosecutor]: Why?

> [Dr. Metzler]: Because each contact with a patient, the general standard is to document that.

> [Prosecutor]: If it happened more than once, if it happened several times, would it not be, would it be the practice also to document that?

> [Dr. Metzler]: That's correct.

¶ 54. During this portion of Dr. Metzler's rebuttal testimony, Thiel's counsel did not object. However, the circuit judge intervened and asked if this statement and

others like it represented Dr. Metzler's personal opinion. Dr. Metzler indicated that it was his personal opinion.

¶ 55. On cross-examination, Thiel's counsel did an able job of exposing the deficiency that Dr. Metzler's statements did not represent a standard in the community of practicing psychiatrists. He did not, however, move to strike Dr. Metzler's opinion testimony.

¶ 56. Trial counsel did not know what Dr. Metzler would testify to as an expert. He was not given nor did he ask for an offer of proof or summary of Dr. Metzler's intended testimony before trial. Because Dr. Metzler was a rebuttal witness, however, and because of trial counsel's competent cross-examination, we cannot conclude that counsel's performance in not moving to *strike* Dr. Metzler's testimony was constitutionally deficient. Counsel's lack of preparation to deal with this expert witness was part of a larger pattern of inadequate pretrial preparation.

¶ 57. In sum, we support the circuit court's conclusion that these aspects of counsel's performance fell below the standard expected of a reasonable attorney. Counsel was deficient in his (1) failure to read discovery materials; (2) failure to undertake any independent investigation regarding JoAnn's and other witnesses' credibility and accounts of relevant events; and (3) misunderstanding and thus misapplication of § 972.11(3).

V

¶ 58. We now address *Strickland*'s prejudice prong. To find prejudice, we must find that the effect of these multiple deficiencies prejudiced Thiel and under-

mined confidence in the outcome of the trial. *See Strickland,* 466 U.S. at 694; *Johnson,* 153 Wis. 2d at 129.

¶ 59. This court has never specifically addressed the issue of how to calculate prejudice arising from multiple deficiencies by trial counsel when the specific errors, evaluated individually, do not satisfy the prejudice standard in *Strickland.*[11] Several circuits of the United States Court of Appeals have addressed the appropriateness of looking at the cumulative effect of multiple instances of deficient performance by counsel when assessing prejudice. The consensus appears to hold that when a court finds numerous deficiencies in a counsel's performance, it need not rely on the prejudicial effect of a single deficiency if, taken together, the deficiencies establish cumulative prejudice. *See Washington v. Smith,* 219 F.3d 620, 634–35 (7th Cir. 2000) ("Evaluated individually, these errors may or may not have been prejudicial to Washington, but we must assess 'the totality of the omitted evidence' under

---

[11] In *State v. Johnson,* 153 Wis. 2d 121, 449 N.W.2d 845 (1990), this court implied that multiple deficiencies be looked at collectively in an analysis of prejudice. We remarked, "Under the totality of the circumstances in this case, we do not find that any of the alleged areas of deficient performance *singly or jointly* caused prejudice to the defendant." *Id.* at 134 (emphasis added).

*Strickland,* rather than the individual errors."); *Harris v.* Wood, 64 F.3d 1432, 1439 (9th Cir. 1995).[12] Although

[12] *See also Gonzales v. McKune,* 247 F.3d 1066, 1078 n.4 (10th Cir. 2001), *vacated in part on rehearing en banc by Gonzales v. McKune,* 279 F.3d 922 (10th Cir. 2002); *Turner v. Duncan,* 158 F.3d 449, 457 (9th Cir. 1998) ("When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice."); *Wade v. Calderon,* 29 F.3d 1312, 1319 (9th Cir. 1994), *cert. denied,* 513 U.S. 1120 (1995); *Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir. 1991) ("Since Rodriguez's claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together.").

The Seventh Circuit has been perhaps the most pronounced in advancing the view that counsel's errors should be combined to determine if the prejudice prong of the *Strickland* test is met. *See Hough v. Anderson,* 272 F.3d 878, 891 n.3 (7th Cir. 2001); *Washington v. Smith,* 219 F.3d 620, 634–35 (7th Cir. 2000); *Williams v. Washington,* 59 F.3d 673, 682 (7th Cir. 1995) ("In addition, [Williams] must be able to demonstrate that the complained of deficiency resulted in prejudice. . . . In making this showing, a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was substantial enough to meet *Strickland*'s test."); *Drake v. Clark,* 14 F.3d 351, 356 (7th Cir. 1994) ("The cumulative effect of individual acts or omissions 'may be substantial enough to meet the *Strickland* test.'") (quoting *United States, ex rel. Kleba v. McGinnis,* 796 F.2d 947, 958 (7th Cir. 1986)); *Kubat v. Thieret,* 867 F.2d 351, 370 (7th Cir. 1989). As a result, federal district courts in Wisconsin have followed this approach. *See, e.g., United States v. Mosiman,* 604 F. Supp. 1003, 1008 (E.D. Wis. 1985) ("Although each allegation of attorney incompetence is examined individually, the cumulative impact of the incidents is also to be considered.") (citing *Crisp v. Duckworth,* 743 F.2d 580, 583 (7th Cir. 1984)).

some circuits have decided to the contrary,[13] we adopt the reasoning of the courts that have held that prejudice should be assessed based on the cumulative effect of counsel's deficiencies.

¶ 60. This approach is sensible and in accord with *Strickland. See Gonzales v. McKune,* 247 F.3d 1066, 1078 n.4 (10th Cir. 2001) ("*Strickland* . . . makes it clear that all acts of inadequate performance may be cumulated in order to conduct the prejudice prong."). Just as a single mistake in an attorney's otherwise commendable representation may be so serious as to impugn the integrity of a proceeding, the cumulative effect of several deficient acts or omissions may, in certain instances, also undermine a reviewing court's confidence in the outcome of a proceeding. Therefore, in determining whether a defendant has been prejudiced

---

Other courts, while not directly holding that the cumulative effect of multiple deficiencies must be weighed together to determine prejudice, have intimated that such an analysis is proper. *See, e.g., Seymour v. Walker,* 224 F.3d 542, 557, (6th Cir. 2000) ("Because the individual claims of ineffectiveness alleged by [the defendant] are all essentially meritless, [she] cannot show that the cumulative error of her counsel rendered him ineffective."); *Buehl v. Vaughn,* 166 F.3d 163, 180 (3d Cir. 1999); *McNeil v. Cuyler,* 782 F.2d 443, 451 (3d Cir. 1986) ("Upon reviewing the cumulative effect of these actions and omissions, however, we do not think there is a 'reasonable probability' that without them, the result of the trial would have been different.").

[13] *See Fisher v. Angelone,* 163 F.3d 835, 852 (4th Cir. 1998) ("To the extent this Court has not specifically stated that ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively, we do so now."); *Girtman v. Lockhart,* 942 F.2d 468, 474–75 (8th Cir. 1991).

as a result of counsel's deficient performance, we may aggregate the effects of multiple incidents of deficient performance in determining whether the overall impact of the deficiencies satisfied the standard for a new trial under *Strickland.*

¶ 61. Lest there be any misunderstanding, a convicted defendant may not simply present a laundry list of mistakes by counsel and expect to be awarded a new trial. A criminal defense attorney's performance is not expected to be flawless. The Sixth Amendment does not demand perfection. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. Moreover, in most cases errors, even unreasonable errors, will not have a cumulative impact sufficient to undermine confidence in the outcome of the trial, especially if the evidence against the defendant remains compelling. Finally, each alleged error must be deficient in law—that is, each act or omission must fall below an objective standard of reasonableness—in order to be included in the calculus for prejudice.

¶ 62. As the preceding discussion indicates, whether the aggregated errors by counsel will be enough to meet the *Strickland* prejudice prong depends upon the totality of the circumstances at trial,[14] not the "totality of the representation" provided to the defendant.[15] *Thiel,* No. 01–1589, unpublished slip op., ¶ 1.

---

[14] In most case, the prejudice prong will depend upon the "totality of the evidence" at trial. There are some cases, however, in which this phrase fails to capture the problem of defenses not raised and evidence not introduced.

[15] According to *Strickland:*

The fundamental purpose of the Sixth Amendment's guarantee of effective assistance of counsel is not to assess the overall performance of counsel but to ensure that the adversarial process functions fairly and reliably. As the Supreme Court put it:

> the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

*United States v. Cronic,* 466 U.S. 648, 658 (1984). This inquiry directs analysis on the issue of prejudice to *the effect* of deficient performance on the overall reliability of the trial. This is a substantively different focus from an overall assessment of an attorney's performance.

¶ 63. Under the facts set forth by the circuit court, and under our de novo review of trial counsel's performance, there are three aspects of counsel's per-

---

> In making this determination [of prejudice], a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland v. Washington,* 466 U.S. 668, 695–96 (1984).

formance that we found deficient. Based on our review of the effect of Thiel's counsel's various errors, we doubt whether any of counsel's deficiencies individually prejudiced Thiel to such a degree as to warrant a new trial. However, we need not look at the prejudice of each deficient act or omission in isolation, because we conclude that the cumulative effect undermines our confidence in the outcome of the trial.

¶ 64. First, we look to trial counsel's failure to read all discovery. The circuit court found that counsel had not read the reports of Drs. Metzler and Stwertka.

1. The defense theory was that the complainant's accusation was in retaliation for Thiel's refusal to assist her in obtaining disability benefits. One medical report quoted JoAnn as being "enraged" that Thiel had not helped her file for disability and admitting that she threatened Thiel with physical evidence in retaliation. These statements explicitly supported the defense theory in the complainant's own words. Another medical report quoted JoAnn as saying that she had not been employed for a period of three or four years. This statement might have aided JoAnn's disability claim, but it was directly contrary to testimony she gave at trial. Counsel was not able to use this information to impeach the complainant because he had not read the documents.

2. Dr. Metzler's report showed that JoAnn continued to lie about the semen while she was in therapy, after she had gone to the police. Her statement could have been used to show an additional lie and to impeach her explanation that her false evidence was simply a ruse to elicit a confession from Thiel. The circuit court observed, "the fact that in a confidential setting [JoAnn] was lying to a therapist who was trying to help her was potentially powerful. The same is true of her state-

ments to Metzler about obtaining the semen from Thiel some 16 months before her conversation with [Thiel] on August 31, 1999." Counsel could not use this information because counsel had not read the report.

3. JoAnn told the police she was afraid of Thiel, yet she met with him after she filed her complaint. The fact that this meeting occurred is also contained in a police report. This incident was not exploited by counsel at trial. Reliance on the medical report for impeachment would have been safer than reliance on the police report, *if* counsel was familiar with the police report.

4. The fact that counsel never read the medical reports may explain why counsel did not try harder to investigate Wis. Stat. § 972.11(3) and why the State was free to produce Dr. Metzler as a rebuttal witness without fear of cross-examination that would embarrass the complainant.

¶ 65. Thiel also alleges that trial counsel did not read or absorb all the police reports. While this clearly constitutes deficient performance, if true, it is not easy to determine the extent of any prejudicial effect on Thiel's defense, because it is difficult to discern what trial counsel read and did not use as opposed to what he did not read at all. For example, the circuit court noted that counsel did not bring out at trial that JoAnn misidentified Thiel's address. On the basis of the appellate record, we cannot be sure that trial counsel did not review this material and merely decide not to employ it as a matter of strategy. Thus, without specifics as to what trial counsel overlooked, we cannot find that this failure had a negative impact to Thiel's defense.

¶ 66. Second, we look to the impact of counsel's failure to independently investigate the underlying facts of the complainant's account. The evidence not discovered because of counsel's failure to investigate

609

reasonable lines of inquiry was relevant and potentially very helpful to Thiel's defense.

¶ 67. For example, Brian Ekern was presented to the jury as an officer of the court. He provided a critical "prior consistent statement" allegedly made by JoAnn about the alleged sexual relationship. This statement was purportedly made before JoAnn had developed a motive to falsely accuse Thiel.

¶ 68. A prior consistent statement is admissible in evidence under Wis. Stat. § 908.01(4)(a)2. This evidentiary rule provides:

> A statement is not hearsay if:
>
> (a) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
>
> . . . .
>
> 2. Consistent with the declarant's testimony and is offered to rebut the express or implied charge against the declarant of recent fabrication or improper influence or motive. . . .

¶ 69. The complainant told police that she disclosed her sexual relationship with Thiel to Ekern in February 1999. At trial, however, she testified that she made the disclosure in 1998. The next day she changed her testimony claiming that she made the disclosure in 1999. The "prior consistent statement" to Ekern was admitted, over objection, on the assumption that this disclosure was made in February 1999, six months before JoAnn went to the police. The admissibility of this evidence would be questionable if the disclosure were not made to Ekern until late July 1999.

¶ 70. There is a good deal of evidence in the record now to suggest that Ekern did not receive this information until July 26, 1999. Thiel's counsel failed to pin down the date that Joann told Ekern the whole story of the alleged assaults. Thus, counsel failed to prevent the admission of what is arguably hearsay evidence. In addition, greater investigation on this point might have unearthed damaging phone records that could have been used to impeach Ekern's testimony at trial.

¶ 71. There appears to be little evidence that counsel conducted an investigation to disprove JoAnn's version of events and to catalog all of JoAnn's inconsistencies for impeachment. A more extensive interview with Lt. Brohmer might have revealed that JoAnn had difficulty directing Brohmer to Thiel's house and that Thiel's neighbors did not recall seeing JoAnn or her car at Thiel's house. That information would have been very damaging to the complainant. Given the inconsistencies and discrepancies that counsel could have found that would have further impeached and undermined the credibility of the State's witnesses, counsel's failure to investigate significantly undermined Thiel's defense in this case, in which the credibility of the complainant was paramount.

¶ 72. Third, counsel's failure to move to admit evidence under Wis. Stat. § 972.11(3) did not add much to the negative impact that resulted from the failure to read medical records in the discovery. The principal benefit that Thiel would have realized from a timely motion to offer the notes was the introduction of the same evidence that he was alleged not to have read. On the other hand, Dr. Metzler was not called in the State's case-in-chief. He would have been a riskier rebuttal witness for the State if the defense had been able to use

611

him to bring out damaging material in the medical reports. At bottom, counsel's failure with respect to § 972.11(3) did not materially increase the prejudice to Thiel's defense.

¶ 73. Finally, we do not include counsel's failure to strike Dr. Metzler's testimony as part of our calculation of prejudice. No doubt, striking Dr. Metzler's testimony would have been of some assistance to Thiel. Dr. Metzler's testimony permitted the inference that if JoAnn had in fact come to Thiel's home three times for professional reasons as he claimed, he would have documented the visits in JoAnn's records. His failure to provide such documentation implied an impropriety in these visits. Nonetheless, trial counsel softened the impact of this inference on cross-examination. Counsel elicited from Dr. Metzler that there were in fact no standards in the psychiatric community about documenting patient visits. Thus, any negative impact to Thiel was mitigated by trial counsel's cross-examination. Inasmuch as we do not find deficient performance in counsel's failure to move to strike the testimony, this incident is not considered in the calculation of prejudice.

¶ 74. Overall, counsel's objectively unreasonable failures seriously affected his ability to impeach the credibility of the complainant and some of the State's witnesses. It also weakened his ability to protect Thiel's credibility. The cumulative result of these failures was to keep from the jury important, additional discrepancies in JoAnn's account of the alleged encounters as well as discrepancies in her discussions with other persons.

¶ 75. At the trial, in the absence of the jury, Judge Pasell sparred with defense counsel, who wanted to inquire about the source of the semen: "What's the relevance of that?" the judge asked. "It's conceded that

she lied, it's conceded that she gave false evidence, it's conceded that this was not Mr. Thiel's semen."

¶ 76. The court's quick assessment on the second day of trial highlights the issue in this case. The State argues that counsel's errors did not amount to prejudice because the jury already realized that the complainant was a liar. The court of appeals declared that: "It is true that credibility was the issue, but the jury had that well laid out before them. We see no prejudice in counsel's failure to pursue opportunities to present such cumulative credibility evidence." *Thiel,* No. 01–1589, unpublished slip op., ¶ 26.

¶ 77. After trial, after the *Machner* hearing, the circuit court saw it differently, saying:

> In this case, the victim's credibility was vital. . . .
>
> . . . The credibility of the complainant was critical to the State's presentation. It was subject to attack with readily available information. Although the jury was aware of some information impeaching her credibility, the other evidence developed at the postconviction hearing was of sufficient quantity and persuasiveness to put into question the reliability of the proceedings held in this trial.

¶ 78. The nature of the credibility evidence in this case cannot be characterized as merely cumulative. We find instructive on this matter *Washington v. Smith,* 219 F.3d 620 (7th Cir. 2000), a decision of the Seventh Circuit Court of Appeals concerning a Wisconsin case that had denied an ineffective assistance of counsel claim largely on grounds that omitted evidence of additional alibi witnesses was merely cumulative. We find the following reasoning particularly relevant to assessing Thiel's claim:

613

> The impact of three more witnesses corroborating Washington's alibi would not have been "cumulative" as the Wisconsin Court of Appeals believed. Evidence is cumulative when it "supports a fact established by existing evidence," *Black's Law Dictionary* 577 (7th ed. 1999), but Washington's whereabouts on *the* day of the robbery was far from established—it was the issue in the case. The fact that [another witness] had already testified to facts consistent with Washington's alibi did not render additional testimony cumulative. Indeed, the additional testimony . . . would have added a great deal of substance and credibility to Washington's alibi.

*Id.* at 634.

¶ 79. As in *Washington,* the veracity of JoAnn's claims of sexual relations with Thiel was not established to such a degree that additional evidence could not have further undermined her credibility and generated reasonable doubt as to Thiel's guilt. While much of the State's evidence at trial was strong, the evidence of Thiel's guilt was not beyond dispute. Moreover, additional credibility evidence might have affected the number of charges on which Thiel was convicted. We are concerned about underestimating the importance of cumulative credibility evidence in a case that depends so heavily on the credibility of the complainant. We agree with the circuit court that credibility was *the issue* upon which a reasonable doubt turned.[16] In this case, there was no physical evidence of the alleged sexual encounters, nor did any of the supportive wit-

---

[16] In *State v. Pitsch,* 124 Wis. 2d 628, 369 N.W.2d 711 (1985), we noted that an error that went to the defendant's credibility, when his credibility was the "central issue in th[e] case," satisfied the *Strickland* test for prejudice, even though there was sufficient evidence in the case to sustain the conviction. *Id.* at 644–46.

nesses who testified present evidence regarding their observation, direct or indirect, of the alleged encounters. Rather, the State's witnesses all served to bolster or otherwise credit JoAnn's version of the facts. The unreasonable errors that disabled Thiel's counsel from presenting material, discrediting facts pertinent to JoAnn's account of the alleged encounters shakes our confidence in the result of this proceeding.[17]

¶ 80. Finally, the State has outlined many aspects of Thiel's counsel's performance that were reasonable and effective. Our review of the record confirms these actions. Thiel does not contend, nor do we, that counsel performed poorly in all portions of his representation or that no evidence was presented in support of Thiel's case. But the State's observation misses the point, and it shows the danger in the court of appeals' "totality of the representation" standard for determinations of prejudice under *Strickland*. As we explained above, the proper inquiry for assessing prejudice is not the totality of counsel's performance, but rather the effect of

---

[17] The State points to *State v. Trawitzki*, 2001 WI 77, 244 Wis. 2d 523, 628 N.W.2d 801, to support its argument that evidence related to credibility should be deemed cumulative in this case. In *Trawitzki*, we rejected the defendant's ineffective assistance of counsel claim by holding that the failure to put on cumulative evidence in the form of prior convictions of witnesses did not create a reasonable probability of a different outcome. *Id.*, ¶¶ 43–45. Unlike *Trawitzki*, where the jury was aware of the witnesses' involvement in the crime that was the subject of the trial and where there existed solid evidence from other sources sufficient to support the conviction, the credibility of the State's witnesses was at the core of this case and constituted the totality of the evidence against Thiel. *See also State v. Sanchez*, 201 Wis. 2d 219, 237, 548 N.W.2d 69 (1996) (finding error not to be prejudicial where the evidence against the defendant was "overwhelmingly probative" of his guilt).

counsel's acts or omissions on the reliability of the trial's outcome. *See Strickland,* 466 U.S. at 694. The key question in Thiel's case is whether the evidence that was omitted or not made fully available to the jury due to the deficiencies in counsel's performance undermined confidence in the outcome of the case, given the totality of the evidence that was adduced at his trial. We conclude that it has.

## VI

¶ 81. For the reasons discussed, we hold that Thiel's trial counsel was deficient in (1) failing to read all discovery materials; (2) in not undertaking any independent investigation regarding JoAnn's credibility when discrediting JoAnn was crucial to Thiel's defense; and (3) by misunderstanding Wis. Stat. § 972.11(3) and failing to file a motion under that provision. While none of these deficiencies, standing alone, would have caused prejudice sufficient to undermine our confidence in the outcome of the trial, given the totality of the circumstances at trial, we find that the cumulative effect of these failures undermines our confidence in the outcome of the trial. We are sufficiently persuaded that the reliability of this proceeding is suspect and that, but for the numerous, unreasonable errors of Thiel's counsel, there is reasonable probability that the result would have been different. Therefore, we reverse the court of appeals decision and we remand this matter to the circuit court for a new trial.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court.