PER CURIAM.
¶1 Lionel T. Ashley appeals from a judgment, entered upon a jury's verdict, convicting him of child abuse (intentionally causing bodily harm). See WIS. STAT. § 948.03(2)(b) (2015-16).[1] Ashley also appeals from an order that denied his postconviction motion without a hearing. He alleges that his trial counsel was ineffective for not calling his victim's mother as a witness at trial. We conclude that trial counsel was not ineffective in her representation of Ashley and that the trial court properly exercised its discretion in denying his request for a Machner hearing. See State v. Machner , 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979). We therefore affirm the judgment and order.
I. BACKGROUND
¶2 Ashley was charged with one count of child abuse in this matter. The criminal complaint alleged that he was involved in an argument with his eleven-year-old stepson, A.R., in the family home and that he punched A.R. in the eye.
A.R.'s testimony.
¶3 During the jury trial, A.R. testified that his stepfather, Ashley, punched him in the eye. He said the altercation began when Ashley wrongly accused him of waking his sister the night before. Ashley loudly asked A.R. why he had done that. A.R. denied doing so, and Ashley picked him up and threw him to the ground in the living room causing him to land on his back. A.R. testified that his mother was present.
¶4 A.R. stated that Ashley then took him into a bedroom where Ashley removed his belt and started "whooping" A.R. on the right leg. A.R. said his mother came in the room, took the belt out of Ashley's hand, and said "leave him alone."
¶5 According to A.R., Ashley told him to say goodbye to his mother, and then grabbed him by the neck and threw him, causing him to hit the back of his head on the ground. A.R. said he went to the back door to leave, and Ashley punched him in the eye. The back door was in the kitchen, and his mother was in the living room. A.R. said he then went to the bus stop and got on the bus. When he arrived at school, he went to the office and showed "the lady" his eye.
¶6 A.R. told the jury that he went to the hospital and then went to his father's house that night. He said he was living with his father at the time of trial and acknowledged that he had always wanted to live there.
The school social worker's testimony.
¶7 J.M. testified that he was employed as a school social worker at A.R.'s school. On the day of the alleged abuse, J.M. testified that the attendance secretary called him to meet with A.R., who was crying, trembling, and holding his eye, half of which was very dark red. It was 8:30 a.m., right after A.R. and other students got off the buses and came into the school. J.M. testified that A.R. told him his stepfather had punched him in the eye and pushed him down. A.R. told J.M. that his mother did not see the punch but saw the shoving and intervened. A.R. did not mention being whipped with a belt.
¶8 J.M. brought A.R. to the school nurse and called the police. He explained that he is a mandated reporter who is required by state law to report abuse to child protective services or to the sensitive crimes unit at the Milwaukee Police Department.
The investigating police officer's testimony.
¶9 The investigating police officer testified that she went to the hospital where she met with A.R. She observed an injury to his right eye, which was photographed. Photographs were introduced into evidence showing a swollen right eye that was "very red" with a contusion under it.
¶10 The police officer testified that A.R. told her that his stepfather punched him in the right eye before he left for school. A.R. told the police officer that his stepfather asked him why he woke up his sister and when A.R. denied it, his stepfather became angry and pushed him to the ground. He said his stepfather took him into the bedroom and hit him with a belt, pushed him into the hallway causing him to fall on the floor, and pushed him again in the living room. A.R. told the police officer that his stepfather then followed him into the kitchen and punched him in the eye. A.R. also informed the police officer that his mother did not see his stepfather punch him.
¶11 The police officer determined that Ashley was the person A.R. referred to as his stepfather.
Ashley's testimony.
¶12 Ashley testified that he had two prior convictions. He denied pushing A.R. down, striking him with a belt, grabbing him by the neck, and punching him.
¶13 Ashley testified that on the morning of the alleged abuse, he asked A.R. why he did not go to bed the previous night when told to do so. In response, A.R. said he did not have to listen to Ashley or obey him because he was his stepfather. Ashley said he then put his hand on A.R.'s shoulder, and A.R. jerked away. Ashley said A.R.'s mother observed this exchange.
¶14 Ashley told the jury he did not know how A.R. got the injury to his eye. He said he was contacted by police, and he went to the police station where he gave a statement. Ashley told police officers that he was frustrated with the situation where he was the stepfather and A.R.'s biological father was "in the middle." He testified that he told the police officers that in the morning, A.R. had his head down and he grabbed A.R.'s left coat sleeve and asked A.R. to look at him when he was talking. A.R. then jerked away. Ashley testified that A.R. then slipped on the wooden floor in his socks, and his knees buckled.
¶15 Ashley testified that he did not see an injury to A.R.'s eye before he left for school. He told police that the argument between the two was not heated and lasted maybe two minutes.
¶16 Ashley acknowledged that at one point, he asked A.R.'s mother why she was letting A.R. disrespect him. However, he denied that A.R.'s mother told him to stop during the incident. He additionally denied that he followed A.R. to the kitchen that morning. Ashley described his demeanor as "firm" and "fed up" and said that he "wanted [A.R.] to listen."
¶17 In response to questions from the trial court, Ashley testified that A.R. left the house at 7:45 a.m. and the bus stop was two blocks away.
The jury's verdict and Ashley's postconviction motion.
¶18 The jury returned a guilty verdict, and the trial court sentenced Ashley to prison.
¶19 Postconviction, Ashley argued that trial counsel provided ineffective assistance when she failed to call A.R.'s mother, S.W., as a witness at trial.[2] The motion referenced (and included as an attachment) a police report related to the incident. The police report described S.W.'s statement as follows:
Last night, [S.W.] heard her husband, Lionel[ ] Ashley, tell [A.R.] to go to sleep. [A.R.] obviously didn't go to sleep, and [S.W.] heard Ashley say he will not be able to play his video game the next day. This morning, [S.W.] heard Ashley ask [A.R.] why he didn't go to sleep last night, and [A.R.] told Ashley that his daddy told him that he didn't have to listen to him, because he was just a stepdad. [A.R.] got up to walk away, and Ashley grabbed [A.R.]'s coat and asked him why he was walking away. [A.R.] told him that he didn't have to listen to him. Ashley told [A.R.], "I'm taking care of you. I'm doing more for you than your daddy. Don't disrespect me." [S.W.] told Ashley to let go of [A.R.]. She told him to let him go to school, and they could talk about these things when [A.R.] got home. [S.W.] told Ashley that if he was upset at [A.R.], he should have talked about it last night instead of waiting until this morning. [A.R.] and Ashley were arguing back and forth. [A.R.] was going towards his room and told Ashley again that Ashley was not his daddy and he didn't have to listen. Ashley told [A.R.] that he did have to listen to him. [A.R.] said that his daddy said that he will beat you up if you put your hands on me. Ashley told [A.R.] that he was not scared of his daddy, and he would whoop [A.R.]'s butt if he wanted to. [A.R.] began to walk away from Ashley, and Ashley grabbed [A.R.]'s arm and told him to stop being so disrespectful. [S.W.] told Ashley to stop grabbing [A.R.]'s arm. [A.R.] came into the living room and said that he was ready for school. [A.R.] said something that [S.W.] didn't hear as he walked past, and Ashley said, "Why are you letting him be so disrespectful?" [S.W.] tried to explain that this was not the time or place to discuss the matter. Ashley threatened to whoop [A.R.]'s butt, and [S.W.] asked him what for? It was too early for [A.R.] to leave, so [S.W.] talked to him about being old enough to know when it was time to go to bed. [A.R.] was getting ready to leave, and he and Ashley exchanged words again. [A.R.] mumbled something, and Ashley was coming out of the kitchen, but he then followed [A.R.] into the kitchen. Ashley asked [A.R.] why he was being disrespectful, and he told [A.R.] that he would take [A.R.] to school, so they could talk about things. [A.R.] left, and Ashley came into the living room. [S.W.] told Ashley that he takes things too far, and Ashley said that [A.R.] was being disrespectful, and he acted like he didn't have to listen.
[The police officer who authored the report] advised [S.W.] that [A.R.] stated that [S.W.] observed Ashley whooping [A.R.] with a belt, and she observed Ashley grab [A.R.] by the neck and throw him to the floor. [S.W.] denied that she saw any of this, including how [A.R.]'s eye was injured. [S.W.] stated that Ashley just grabbed [A.R.] by the arm, and [A.R.] fell on the slippery floor.
(Italics added; some uppercasing omitted.)
¶20 In his postconviction motion, Ashley contrasted S.W.'s statement to police with the statement made by A.R. A.R. reported:
When [A.R.]'s stepdad pushed him to the ground, [A.R.]'s mom told his stepdad to stop pushing him to the ground. [A.R.]'s stepdad didn't listen, and he took [A.R.] into his bedroom. [A.R.]'s stepdad took his belt from his pants and whooped [A.R.]'s right thigh over his pants, so it didn't hurt. [A.R.] doesn't remember how many times his stepdad whooped him with the belt, but it didn't hurt. [A.R.]'s mom came in and grabbed his stepdad's arm and she grabbed the belt. His stepdad still had [A.R.]'s arm, and he threw [A.R.] in the hallway. [A.R.] went into the living room and sat down. When he got up, his stepdad told him to say goodbye to his mom, so he said goodbye. His stepdad grabbed [A.R.] by the neck and threw him to the ground. [A.R.]'s mom was standing behind his stepdad and told his stepdad to stop.
Ashley further alleged in the postconviction motion that an investigator working on his behalf spoke to S.W., who stated that she was not subpoenaed to testify at trial, nor was she ever contacted by Ashley's trial counsel or anyone working for trial counsel.
¶21 The trial court denied the motion without a hearing concluding that even if trial counsel performed deficiently when she failed to call S.W. as a witness, no prejudice resulted.
II. DISCUSSION
¶22 The sole issue on appeal is whether Ashley is entitled to a Machner hearing on his claim that trial counsel provided ineffective assistance when she failed to interview S.W. and failed to call her as a witness at trial. He contends that S.W.'s account of the incident differed dramatically from A.R.'s, and consequently, it would have called A.R.'s credibility into question.
¶23 "A hearing on a postconviction motion is required only when the movant states sufficient material facts that, if true, would entitle the defendant to relief." State v. Allen , 2004 WI 106, ¶14, 274 Wis. 2d 568, 682 N.W.2d 433. Whether the motion alleges such facts is a question of law. See id. , ¶9. If the motion raises sufficient material facts, the trial court must hold a hearing. See id. If the motion does not raise sufficient material facts, if the motion presents only conclusory allegations, or if the record conclusively shows the defendant is not entitled to relief, then the decision to grant or deny a hearing is left to the trial court's discretion. See id. A trial court's discretionary decisions are reviewed for an erroneous exercise of that discretion, a deferential standard. See State v. Sulla , 2016 WI 46, ¶23, 369 Wis. 2d 225, 880 N.W.2d 659.
¶24 To prevail on an ineffective assistance claim, the defendant must show both that counsel was deficient and that the deficiency was prejudicial. See State v. Erickson , 227 Wis. 2d 758, 768, 596 N.W.2d 749 (1999). To show deficient performance, "the defendant must identify specific acts or omissions ... that fall 'outside the wide range of professionally competent assistance.' " See State v. Taylor , 2004 WI App 81, ¶13, 272 Wis. 2d 642, 679 N.W.2d 893 (citation omitted). The test for prejudice is "whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " State v. Balliette , 2011 WI 79, ¶24, 336 Wis. 2d 358, 805 N.W.2d 334 (citation omitted).
¶25 Claims of ineffective assistance of counsel present mixed questions of fact and law. See State v. Thiel , 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305. We uphold a trial court's findings of fact unless they are clearly erroneous, but whether those facts show that counsel was ineffective is a question of law. See id. A defendant must satisfy both prongs of the ineffective assistance test; we need not address both if the defendant fails to make a sufficient showing on one. See State v. Maloney , 2005 WI 74, ¶14, 281 Wis. 2d 595, 698 N.W.2d 583.
¶26 Ashley asserts that the discovery materials "revealed that although S.W. was not in the kitchen when ... Ashley was alleged to have struck A.R., she did witness the argument in the living room that led up to the alleged offense." He further contends that "[t]he discovery alerted trial counsel that police asked S.W. about A.R.'s more dramatic claims, and she denied having seen any of that. In fact, she said she only saw ... Ashley grab A.R.'s arm, and that A.R. fell on the slippery floor. This is consistent with ... Ashley's testimony at trial."
¶27 Ashley acknowledges that only he and A.R. were in the kitchen when he allegedly struck A.R., and, as such, determining what happened in the kitchen could be resolved only by weighing his credibility against A.R.'s. He submits that S.W. had material information bearing on A.R.'s credibility. Namely, S.W.'s testimony would have supported Ashley's version of the events that transpired and would have highlighted the inconsistencies in A.R.'s version.
¶28 In this case, we need not address the first prong of the ineffective-assistance test. Even accepting Ashley's contention that his trial counsel performed deficiently, he has not demonstrated a reasonable probability that the verdict would have been different had the jury heard S.W. testify. See State v. Sholar , 2018 WI 53, ¶46, 381 Wis. 2d 560, 912 N.W.2d 89 (while a defendant "need not prove the jury would have acquitted him ... he must prove there is a reasonable probability it would have, absent the error") (underlining omitted, italics added).
¶29 S.W. was not in the kitchen when Ashley was alleged to have struck A.R. and, therefore, could not say that it did not happen. According to Ashley, this is of no consequence because S.W.'s testimony "would have been that A.R. lied about nearly everything else ." (Emphasis in original.) We are not convinced. While portions of S.W.'s statement were at odds with A.R.'s testimony, other portions support the State's case in that she describes an escalating confrontation, which included threats by Ashley to "whoop" A.R. and ended with Ashley following A.R. into the kitchen after A.R. mumbled something. When Ashley returned to the living room, S.W. reported telling him that he takes things too far.
¶30 A.R. testified that the confrontation culminated with Ashley punching him in the eye, and evidence at trial corroborated his testimony. This evidence included the testimony of A.R.'s prompt reporting of the incident, his demeanor, and the physical injury. On this record, there is no reasonable probability that had the jury heard S.W. testify, it would have had a reasonable doubt as to his guilt. Cf. id. , ¶43 (explaining that the record "clearly thwart[ed]" the defendant's ability to prove prejudice). Consequently, the trial court properly denied Ashley's postconviction motion without a hearing.
By the Court. -Judgment and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

Ashley additionally argued that trial counsel provided ineffective assistance when she failed to object to the trial court's statement that A.R. "did a nice job" when he testified. He does not pursue this issue on appeal.