COURT OF APPEALS
DECISION
DATED AND FILED

October 6, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP494-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2012CF1134**

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

ALPHONSO LAMONT WILLIS,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JEFFREY A. WAGNER, Judge. *Affirmed*.

Before Brash, P.J., Dugan and Donald, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. In 2013, a jury found Alphonso Lamont Willis guilty of two felonies: (1) first-degree intentional homicide by use of a dangerous weapon, as a party to a crime; and (2) being a felon in possession of a firearm. *See* WIS. STAT. §§ 940.01(1)(a), 939.63(1)(b), 939.05, 941.29(2) (2011-12).[1] In postconviction proceedings, Willis alleged that his trial counsel provided ineffective assistance in several ways. The trial court denied Willis's postconviction motions, and he appealed. We affirmed in part, reversed in part, and remanded for a *Machner* hearing on two issues. *See State v. Willis (Willis I)*, No. 2016AP791-CR, unpublished slip op. ¶3 (WI App July 18, 2017) (citing *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979)). On remand, the trial court conducted the evidentiary hearing and ultimately concluded that trial counsel was not ineffective. Willis has again appealed. We affirm.

## BACKGROUND

¶2 In *Willis I*, we provided a detailed summary of the factual and procedural history of this case. *See id.*, ¶¶4-23. In short, a woman named Susan Hassel was shot and killed in her apartment. At trial, the State introduced evidence from three citizen witnesses. Earnest Jackson, Willis's nephew, testified that he was in Hassel's apartment with Willis when Willis shot the woman. Jackson said that afterward, he and Willis walked to a nearby home, where a woman was shoveling snow in her back yard. Jackson said Willis spoke with the woman and then he and Willis walked away.

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶3 The woman who was shoveling snow, Trina Jagiello, testified that she spoke with Willis, who was already familiar to her "by face." Jagiello said Willis was with another man she did not know. Jagiello said Willis told her he was looking for Larry Durrah, who lived in the house with Jagiello. Jagiello said Willis waited on the porch for "five or six minutes" and then walked away after telling Jagiello to tell Durrah that Willis had stopped by.

¶4 Jagiello also testified about the timing of events. She said she started shoveling at 7:30 p.m. and continued for ten to fifteen minutes before Willis arrived. Jagiello said that after Willis left, she finished shoveling and then walked to a nearby store "either a little after 8 [p.m.] or a little before 8 [p.m.]"

¶5 The third citizen witness, Steven Williams, testified that he was with Hassel in her apartment until about 6:00 p.m., at which time he went across the hall to his cousin's apartment and spent time with family members. Later, Williams heard a gunshot. Williams said he opened his apartment door and saw Willis—who Williams knew was a friend of Williams's nephew—and "another guy" exiting Hassel's apartment. Williams said Willis "had his head down" and "was trying to hide" a gun that had "smoke coming out of" the gun barrel. Williams said the two men left the building.

¶6 Williams said he entered Hassel's apartment, saw that she was dead, retrieved his clothes from the apartment, and left. He told his relatives that Hassel was dead, and Williams's uncle called 911. Willis testified that two other individuals, named Edward and Nicole, also entered Hassel's apartment with him.

¶7 In addition to introducing testimony from three citizen witnesses, the State called numerous law enforcement officers. One officer testified about

footprints in the snow that he observed when he arrived at the crime scene. In our prior decision, we summarized that testimony as follows:

> Officer Michael Hansen testified he was dispatched to the shooting at about 8:02 p.m. and arrived relatively quickly because he was in the area. After he arrived, Hansen saw two separate sets of impressions (one made by shoes, the other by boots) in the freshly-fallen snow on the east side of Hassel's apartment building. Hansen followed the impressions south until the boot impressions stopped in front of Jagiello's house. When Hansen arrived at Jagiello's house, he was met out front by a woman who was shoveling snow. After Hansen tracked the impressions, he went back to the scene and placed a bucket over the boot and shoe impressions.

*Willis I*, No. 2016AP791-CR, ¶14.

¶8 Detective Robert Rehbein testified that when he arrested Willis four days after the crime, Willis was wearing black leather boots, which the detective seized. In our prior decision, we noted:

> Through Rehbein and Hansen, the State introduced over twenty exhibits pertaining to Willis's boots and the route of the boot and shoe impressions including: photos of shoe and boot impressions next to Hassel's apartment building; close up photos of the boot impression in the snow; a Google map on which Hansen drew the route of the impressions; the inventory sheet of Willis's boots and the actual boots Willis was wearing when he was arrested; photographs of the soles of the boots Willis was wearing when he was arrested; and a photo of Willis's boots size and style.

*Id.*, ¶18.

¶9 Although the State introduced photographs of the footprints and the boots Willis was wearing when he was arrested, the State did not introduce testimony from an officer or an expert opining that Willis's boots made the footprints in the snow. Instead, the State told the jurors in its opening statement

that they would "be able to look at the boots and look at the footprints left in the snow … that were photographed and measured by the police which[,] you will see photographs of those, matched the boots from Alphonso Willis." In its closing argument, the State urged the jurors to look at the photographs and the boots. The State asserted: "I don't expect anyone to become an expert and look at them, but I think a layperson can say, 'Look, these are the same type of boots, same size of boots.'" Trial counsel objected to this argument, but the objection was overruled.

¶10     Before his first appeal, Willis filed two postconviction motions. The second motion contained a report from a forensic examiner Willis retained after his conviction. The examiner concluded, based on an examination of the pattern on the bottom of Willis's boot, that the boots Willis was wearing when he was arrested four days after the shooting were not the boots that made the footprints in the snow. The trial court denied both postconviction motions without a hearing.

¶11     On appeal, we rejected Willis's arguments on numerous issues, but we concluded that Willis was entitled to a *Machner* hearing concerning whether trial counsel provided ineffective assistance by:  (1) failing to "obtain a witness to rebut the State's boot print evidence, and (2) introduce evidence regarding the time of the victim's death." *See Willis I*, No. 2016AP791-CR, ¶3.

¶12     On remand, the trial court conducted a *Machner* hearing where only trial counsel testified. The trial court asked both parties to submit proposed findings of fact and conclusions of law. In a written order, the trial court adopted the State's proposed findings of fact and conclusions of law and denied Willis's motion for a new trial. The trial court provided additional analysis, concluding that trial counsel did not perform deficiently with respect to the boot print

evidence and that Willis was not prejudiced by trial counsel's failure to present certain evidence concerning the time of death. This appeal follows.

## DISCUSSION

¶13 Willis seeks a new trial on grounds of ineffective assistance of trial counsel. Our supreme court has summarized the pertinent standards to address an ineffective assistance of counsel claim as follows:

> Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact. The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review *de novo*. To demonstrate that counsel's assistance was ineffective, the defendant must establish that counsel's performance was deficient and that the deficient performance was prejudicial. If the defendant fails to satisfy either prong, we need not consider the other.
>
> Whether trial counsel performed deficiently is a question of law we review *de novo*. To establish that counsel's performance was deficient, the defendant must show that it fell below "an objective standard of reasonableness." In general, there is a strong presumption that trial counsel's conduct "falls within the wide range of reasonable professional assistance." Additionally, "[c]ounsel's decisions in choosing a trial strategy are to be given great deference."
>
> Whether any deficient performance was prejudicial is also a question of law we review *de novo*. To establish that deficient performance was prejudicial, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*State v. Breitzman*, 2017 WI 100, ¶¶37-39, 378 Wis. 2d 431, 904 N.W.2d 93 (citations omitted; italics added; bracketing in original).

¶14    Our standard of review for ineffective assistance of counsel claims presents "a mixed question of law and fact." *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). The findings of fact made by the trial court, "'the underlying findings of what happened,' will not be overturned unless clearly erroneous." *Id.* (citation omitted). However, "[t]he ultimate determination of whether counsel's performance was deficient and prejudicial to the defense are questions of law which this court reviews independently." *Id.* at 128.

¶15    On appeal, Willis has not challenged the trial court's findings of fact or trial counsel's testimony at the *Machner* hearing. Accordingly, the issue before this court is whether trial counsel provided ineffective assistance to Willis, based on undisputed facts, which is a question of law. *See Johnson*, 153 Wis. 2d at 128.

**I. Trial counsel did not perform deficiently by not obtaining a witness to rebut the State's boot print evidence.**

¶16    The first issue addressed at the *Machner* hearing was whether trial counsel should have obtained a witness to rebut the State's boot print evidence. Appellate counsel asked trial counsel whether he had compared the footprints from the scene to Willis's boots and why he did not seek assistance from the state crime lab or a privately retained expert. Trial counsel testified that he did not do a "comparison analysis" of the footprints and Willis's boots because he:

> did not view strategically that … a Lugz [brand] shoe, which is commonly sold, worn in the urban area, that the [S]tate would be able to make the connection. Nor did they have in their report that definitively that the only boot in the world worn by my client at the time was, in fact, his; therefore, identified him directly. [Sic.] That was tenuous.
>
> So no, I didn't do that comparison based upon that. It wasn't a unique type of boot. It was just a basic Lugz shoe.

Trial counsel further explained that he did not seek a comparison of the footprint and Willis's boots because he "didn't think that at that point and time strategically that was the crux of the [S]tate's case … [b]ecause of the general nature of the shoe and the report written by the detective did not make a conclusory statement."

¶17 Trial counsel acknowledged that the criminal complaint alleged that when "Willis was arrested he was wearing shoes which matched the prints on one set of the footprints." Trial counsel noted, however, that the complaint is "not evidence," and he emphasized that Detective Rehbein's report did not directly link Willis's boots to the footprints. On cross-examination, trial counsel agreed with the State's observation that "nobody wrote a report indicating that the tracks in the snow [were] a match to the soles of [Willis's] boots which he was found wearing days after the homicide." Trial counsel also noted that the State had not designated an expert to testify that the footprints matched Willis's boots. Trial counsel added that he did not believe that consulting an expert would "conclusively" demonstrate that Willis was not present at the scene. Finally, trial counsel said he was more focused on attacking the credibility of Jackson and Williams, who both said they saw Willis at the victim's apartment.

¶18 In its written order denying the postconviction motion, the trial court implicitly accepted trial counsel's testimony and concluded that trial counsel did not perform deficiently. The trial court explained:

> Although trial counsel may have been aware of an *inference* that the boot prints in the snow were similar to the boots worn by the defendant when he was arrested, the court cannot conclude that counsel was deficient in failing to hire an expert when the [S]tate never revealed any evidence before trial that the boot soles were a match. It was only an inference that trial counsel felt he could defeat based on his defense strategy.

¶19    We begin our analysis with the proposition that "[t]rial strategy is afforded the presumption of constitutional adequacy." *See Breitzman*, 378 Wis. 2d 431, ¶65. *Breitzman* continued:

> Reviewing courts should be highly deferential to counsel's strategic decisions and make every effort … to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. This court will not second-guess a reasonable trial strategy, [unless] it was based on an irrational trial tactic or based upon caprice rather than upon judgment.

*Id.* (citations and internal quotation marks omitted; ellipses and bracketing in original).

¶20    Applying those standards, we conclude that trial counsel's performance was not constitutionally deficient. Prior to trial, the State did not provide any reports indicating that the boots matched the footprints, and the State did not include a footprint expert on its witness list. It was reasonable for trial counsel not to seek an expert to rebut an opinion that he did not expect would be offered at trial. Further, it was reasonable for trial counsel to recognize that excluding the boots worn days after the homicide would not prove that Willis was not present at the scene. In hindsight, trial counsel may have wished that he had secured an expert to testify about the boots, given the State's opening statement and closing argument, but trial counsel's strategic decision, based on the information available at the time, was reasonable. *See id.*

¶21    Because we have concluded that trial counsel's performance was not constitutionally deficient, we need not address whether Willis was prejudiced when trial counsel did not secure an expert. *See id.*, ¶37. Further, because we have rejected the first of two claims that trial counsel performed deficiently, we

will not address Willis's cumulative prejudice claim. *See State v. Thiel*, 2003 WI 111, ¶59, 264 Wis. 2d 571, 665 N.W.2d 305 (recognizing that appellate courts will analyze a cumulative prejudice claim when there have been "multiple instances of deficient performance by counsel").

## II. Willis was not prejudiced by trial counsel's failure to introduce phone call evidence relating to the time of Hassel's death.

¶22 The second issue addressed at the *Machner* hearing concerned the timing of Hassel's death. We explained this issue in our earlier decision:

> Willis's original postconviction motion asserted that trial counsel was ineffective in not introducing evidence of Hassel's time of death. That motion identified evidence described in two police reports that could be used to establish Hassel's time of death, including cell phone records showing outgoing calls from Hassel's phone at 7:51 p.m. and 7:55 p.m. and the 911 call at 7:58 p.m.

> Willis argues that no evidence regarding the time of Hassel's death was introduced at trial. He asserts that the following demonstrates that he was not present when Hassel was killed: (1) Jagiello testified that she encountered Willis between 7:40 and 7:45 p.m.; (2) after talking with her for a period of time, Willis and Jackson went to her back door; (3) after five or six minutes, Willis walked away with Jackson; (4) after Willis left, Jagiello finished shoveling, went to the store, and upon leaving, heard the sirens at 8:02 p.m.; (5) there were outgoing calls on Hassel's cell phone that was found in her hand at 7:51 p.m. and 7:55 p.m.; and (6) the 911 call was made at 7:58 p.m.

> ....

> Willis contends that the cell phone, 911 evidence, and other evidence shows that Hassel died sometime after Willis left Jagiello and, therefore, he could not have killed her.

*Willis I*, No. 2016AP791-CR, ¶¶41-42, 47.

¶23    At the *Machner* hearing, trial counsel acknowledged that one could infer that Hassel placed the final call at 7:55 p.m. and was shot between 7:55 p.m. and 7:58 p.m., when the 911 call was placed by her neighbor.  Trial counsel testified that he decided not to introduce that evidence because he wanted to "put that on the [S]tate as it relates to things that they failed to put on."

¶24    Further, in response to cross-examination from the State, trial counsel indicated that it was not clear who placed the calls from Hassel's phone at 7:51 p.m. and 7:55 p.m.  He testified as follows:

> [State:] … Are you aware of any probative evidence showing that [it] was, in fact, the victim who had made those outgoing calls?
>
> [Trial counsel:]  None whatsoever.
>
> [State:]  And given the fact that we've got people inside her apartment after she's dead, isn't it equally likely that somebody other than the victim made those calls?
>
> [Trial counsel:]  Likely, yes.  And that was the other reason why I indicated we wanted that Nicole person who supposedly took a pillow out of the location with some brain fragments and things of that nature.  But we couldn't locate her either, and we weren't granted another adjournment.

Trial counsel also testified that he thought it was possible that an outgoing phone call "could have been a reflex of her being shot with her hand on the phone."

¶25    This testimony demonstrates that trial counsel made strategic decisions concerning whether to introduce evidence of the phone calls placed from Hassel's phone and the call to the 911 operator.  The State argues that trial counsel's "reasoned strategy at the time of trial is entitled to deference even if it 'appears in hindsight that another defense would have been more effective[.]'" *Quoting State v. Brewer*, 195 Wis. 2d 295, 300, 536 N.W.2d 406 (Ct. App. 1995).

¶26    We need not decide whether trial counsel's performance was constitutionally deficient because we conclude that Willis has not proven that he was prejudiced.  *See **Breitzman***, 378 Wis. 2d 431, ¶37.  Specifically, Willis has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See **id.***, ¶39 (citation omitted).

¶27    Willis's prejudice argument is based on his assertion that the three phone calls establish the time of death.  But as trial counsel noted at the ***Machner*** hearing, it is possible that other people placed the two calls from Hassel's phone, so those calls do not definitively establish the time of death.  Further, it was undisputed that after hearing the gunshot, Williams and other individuals entered the apartment, retrieved clothing, and did not immediately call 911.  Therefore, the timing of the 911 call establishes only that Hassel was dead by 7:58 p.m., not that she died at a specific time.

¶28    Moreover, we agree with the State that "[e]ven with that additional call evidence, Jagiello's testimony would still have been consistent with Jackson's account and Willis's guilt."  The State explains:

> Jagiello was confident that she went outside to shovel at 7:30 p.m.  She was not confident in the rest of her time estimations, which she acknowledged repeatedly.  (("I was out there maybe 10, 15 minutes and I heard somebody say, is that Megan"); (Willis stayed on the porch "[m]aybe five or six minutes"); ("I didn't have a watch on.  As far as I know I went to the store either a little after 8 or a little before 8"); ("Q. Did you have exact times?  Did you look at your watch?  Do you have a watch?  A. No").)  As such, the jury only had to reasonably infer that she was slightly incorrect in her admitted guesses of the timeline of events after she went outside to shovel for her account to align with Jackson's.

12

> Willis's arguments fail because they rest on the certainty of Jagiello going outside to shovel at 7:30 p.m. without acknowledging her estimations on the other timeframes. Counsel's failure to introduce evidence that would have still comfortably placed Willis in [Hassel's] apartment first and then at Jagiello's home does not undermine confidence in the jury's verdicts. This is particularly true given the State's witnesses, whose accounts of Willis's guilt corroborated each other, and the footprints walking from the victim's apartment building right to Jagiello's home.

(Record citations omitted.)

¶29 Not only do we agree with this analysis, we reject Willis's argument that "[g]iven the weakness of the State's case, there is more than a reasonable probability that if counsel had introduced powerful evidence of innocence the outcome would have been different." The State's case was not weak. Jackson testified that he watched Willis—his uncle—shoot Hassel. Jackson further testified that he and Willis left the apartment and walked to the home where Jagiello was shoveling. Williams testified, consistent with Jackson's testimony, that after he heard a gunshot, he saw Willis—a man he knew—leaving Hassel's apartment with a gun in his hand. Finally, Jagiello testified that Willis—a man she knew "by face"—talked to her as she was shoveling.

¶30 We are not persuaded that Willis has shown "a reasonable probability" that he would have been acquitted if the defense had introduced evidence of the three phone calls. *See Breitzman*, 378 Wis. 2d 431, ¶39 (citation omitted). Because Willis has not proven that he was prejudiced, he is not entitled to a new trial. *See id.*, ¶37.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.