COURT OF APPEALS
DECISION
DATED AND FILED

November 3, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP598-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2017CF408**

IN COURT OF APPEALS
DISTRICT II

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

ROBERT J. STYNES,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Kenosha County: DAVID M. BASTIANELLI, Judge. *Affirmed*.

Before Gundrum, P.J., Neubauer and Reilly, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Robert J. Stynes appeals the judgment of conviction, following a jury trial, of one count of second-degree reckless homicide. Stynes also appeals the order denying his postconviction motion for relief. Stynes contends that he received ineffective assistance of trial counsel and that the cumulative effect of counsel's errors prejudiced his defense. We disagree and affirm.

## BACKGROUND

¶2 On April 20, 2017, the State charged Stynes with one count of second-degree reckless homicide. The charges related to the death of Stynes's two-month old son, Cameron. According to the criminal complaint, on April 11, 2017, medical personnel responded to Stynes's 911 call reporting that his infant son was not breathing. Stynes told one of the responding officers that he placed Cameron in his bassinet on his back, and then took a nap. Stynes stated that when he awoke from his nap he found Cameron on his stomach, not breathing, and with spit up all over his body. Stynes attempted to resuscitate his son, but was unsuccessful. According to the complaint, Stynes then proceeded to give inconsistent statements to law enforcement. An autopsy later showed that Cameron suffered a skull fracture and internal hemorrhaging consistent with blunt force injury to the head.

¶3 The matter proceeded to trial where multiple witnesses testified. Cameron's mother, A.J., testified that when she was holding the infant at the hospital after he died, she discovered a bump on the back of the skull that had not been there the previous day. The medical examiner who conducted the autopsy testified that the autopsy revealed a skull fracture as well as both subdural and subcranial hemorrhaging, but that he could not form a definitive opinion about the

2

cause of death. Accordingly, the medical examiner's report states Cameron's cause of death as "undetermined." Two forensic pathologists gave expert testimony stating that the cause of death was impact trauma.

¶4 The defense presented evidence from a forensic pathologist who opined that Cameron's cause of death was undetermined. Specifically, the defense expert testified that there was no visible fracture in the photo of Cameron's skull before it was cut during the autopsy. Rather, he stated that what the medical examiner identified as a fracture was actually the result of an autopsy assistant's poor job cutting into the skull with an electrical saw. The defense expert also testified that there was no evidence of blunt force trauma, stating Cameron did not suffer from any hemorrhaging and that what were identified as hemorrhages was actually a "postmortem clot" caused by gravity after Cameron's death.

¶5 On cross-examination, the State established that the defense expert: had been fired from his job at a Florida medical examiner's office in connection with his testimony in the Trayvon Martin case, had surrendered his medical license in two states, was self-employed, and was receiving a $5,000 fee for his work in Stynes's case. On redirect, the defense expert testified that he performed the autopsy on Martin and was a State's witness. He stated that he opined that Martin's death was a homicide and that he stated so on the witness stand. The defense expert further testified that after the defendant was acquitted, he and others were asked to resign their positions. The jury ultimately found Stynes guilty as charged.

¶6 The matter proceeded to sentencing, where the trial court addressed the presentence investigation report (PSI), letters submitted to the court, and a statement from Cameron's mother. Stynes also exercised his right of allocution,

3

telling the court that he did not kill his son. The sentencing court noted that the PSI had "some holes in it" because Stynes had not provided any information to the writer. The sentencing court then discussed the relevant sentencing factors and objectives and sentenced Stynes to fifteen years of confinement and ten years of extended supervision.

¶7 Stynes filed a postconviction motion alleging numerous instances of ineffective assistance of counsel. Stynes alleged that the cumulative effect of counsel's errors prejudiced his defense. The motion alleged that counsel: failed to have a psychologist testify that Stynes's grief caused him to make inconsistent statements after Cameron's death; failed to impeach A.J.'s testimony about Cameron's ability to roll over and whether Cameron "was healthy or was on medication at the time"; failed to object to the use of a video recording created by A.J. the night before Cameron's death; failed to review the autopsy report with the defense expert; failed to enter an x-ray of Cameron's head prior to the autopsy, which showed no fracture; failed to send the autopsy report back with the jury; failed to interview and call the autopsy assistant as a witness; failed to question the defense expert witness about the x-rays taken of Cameron's skull; failed to have Stynes testify in order to render his videotaped statement to police admissible; failed test swabs of a wet spot found on Stynes's bed; failed to interview Stynes's son, age two and one-half at the time, who was present when Cameron died; and failed to adequately prepare Stynes for sentencing.

¶8 At a *Machner*[1] hearing, postconviction counsel elicited testimony from trial counsel on most of the alleged deficiencies; however, postconviction

---

[1] *See* *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

counsel did not question trial counsel about the video of Cameron taken the night before he died, Stynes' videotaped statement to police, the swabs of a wet spot on the bed, and the lack of a defense interview of Stynes's toddler son.[2] Postconviction counsel did, however, raise two new issues: that counsel failed to preemptively address the defense expert's termination from his previous job and that trial counsel failed to argue that Cameron's death was caused by viral pneumonia. Following trial counsel's testimony, the postconviction court denied Stynes's motion. This appeal follows. Additional facts will be included as relevant to the discussion.

## DISCUSSION

¶9 On appeal, Stynes raises many of the same issues raised either in his postconviction motion or at the *Machner* hearing. Stynes contends that the cumulative effect of trial counsel's alleged deficiencies resulted in prejudice. We address each alleged deficiency.

¶10 To prevail on an ineffective assistance claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Thiel*, 2003 WI 111, ¶18, 264 Wis. 2d 571, 665 N.W.2d 305. Counsel's performance is "constitutionally deficient if it falls below an objective standard of reasonableness." *Thiel*, 264 Wis. 2d 571, ¶19. "Counsel's decisions in choosing a trial strategy are to be given great deference." *State v. Balliette*, 2011 WI 79, ¶26,

---

[2] Postconviction counsel had the opportunity to question trial counsel about each of these alleged deficiencies at the *Machner* hearing but did not do so. Because the record is "devoid of any testimony from defendant's trial counsel regarding" these claims, we cannot find deficient performance on these issues and do not address them further. *See Machner*, 92 Wis. 2d at 804.

336 Wis. 2d 358, 805 N.W.2d 334. A reviewing court can determine that defense counsel's performance was objectively reasonable, even if trial counsel offers no sound strategic reasons for decisions made. *State v. Koller*, 2001 WI App 253, ¶53, 248 Wis. 2d 259, 635 N.W.2d 838. This court will sustain counsel's strategic decisions as long as they were reasonable under the circumstances. *See Balliette*, 336 Wis. 2d 358, ¶26.

¶11 Deficient performance is constitutionally prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, ¶24 (citation omitted). The postconviction court's findings of fact will be upheld unless they are clearly erroneous, but whether counsel's performance satisfies the constitutional standard for ineffective assistance of counsel is a question of law, which we review *de novo. See id.*, ¶21.

¶12 Where there are multiple instances of deficient performance, "prejudice should be assessed based on the cumulative effect of counsel's deficiencies." *Thiel*, 264 Wis. 2d 571, ¶59. When determining prejudice, a reviewing court "may aggregate the effects of multiple incidents of deficient performance in determining whether the overall impact of the deficiencies satisfied the standard for a new trial under *Strickland*." *Thiel*, 264 Wis. 2d 571, ¶60.

*Failure to Retain a Trauma Expert*

¶13 First, Stynes contends that trial counsel was ineffective for failing to retain an expert witness to testify about the effect Stynes's grief had on his ability to communicate consistently with law enforcement following Cameron's death.

Whether expert testimony is necessary in a given situation is a question of law, which we decide without deference to a trial court's opinion on the matter. *See Wal-Mart Stores, Inc. v. LIRC*, 2000 WI App 272, ¶11, 240 Wis. 2d 209, 621 N.W.2d 633. Our supreme court has explained that "there is a distinction 'between matters of common knowledge and those needing expert testimony to explain.'" *Id.*, ¶16 (citation omitted). "[E]xpert testimony should be adduced concerning matters involving special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of mankind, and which require special learning, study, or experience." *Cramer v. Theda Clark Mem'l Hosp.*, 45 Wis. 2d 147, 150, 172 N.W.2d 427 (1969).

¶14 At the *Machner* hearing, trial counsel testified that he did not retain an expert to testify about Stynes's inconsistent statements because he did not believe that the testimony would be admissible. Specifically, counsel stated that he did not consider Stynes's statements to be inconsistent, rather, Stynes was speculating about how his son could have died—something any reasonable person in Stynes's position would have done. As the postconviction court noted, it is within the realm of ordinary experience that one who suffers from sudden trauma may not fully grasp or comprehend questions being asked at the height of his or her grief. Indeed, trial counsel explained as much to the jurors. Thus, we agree with the postconviction court that counsel was not required to retain an expert to testify about the effects of Stynes's grief on his statements to law enforcement and did not render deficient performance in this regard.

*Failure to Impeach the Mother*

¶15 Stynes contends that trial counsel was ineffective for failing to impeach A.J. regarding statements she made about Cameron's ability to roll over

and about whether Cameron was healthy and/or on medications at the time of his death.

¶16 Stynes's first argument is based on what he perceives to be a contradiction between A.J.'s trial testimony and statements she made to the Deputy Medical Examiner. At trial, A.J. testified that Cameron was unable to flip from his back onto his stomach. A supplemental autopsy report states that A.J. indicated that the infant "would roll onto his tummy from a side-laying position" in a way that was "more accidental versus purposeful." We agree with the State that the statements are not inconsistent because rolling over from back to front is not the same as rolling onto the stomach from a side position. Accordingly, this issue did not provide a ground for impeachment.

¶17 A.J. also testified that Cameron did not have any illnesses and stated that he was not taking any medications at the time of his death. Stynes asserts that both statements are false because medical records indicate that Cameron was prescribed Zantac over a month before his death for excessive spitting up. At the *Machner* hearing, trial counsel explained that he had "no proof that any of these things like spitting up or any of the other things that are in the records had anything whatsoever to do with the cause of death." Moreover, Stynes admitted to investigators that the medication had been discontinued weeks before Cameron's death. In short, any inconsistencies in A.J.'s testimony were irrelevant.

¶18 Further, counsel testified that he chose not to aggressively question A.J. because he believed it would have been a "very poor strategy" to attack a grieving mother, especially since the theory of defense did not blame A.J. Counsel employed a reasonable trial strategy, which we will uphold. *See Balliette*, 336 Wis. 2d 358, ¶26.

*Failure to Send the Autopsy Report to the Jury*

¶19     Stynes argues that because the autopsy report labeled the cause of death as "undetermined," the autopsy report should have gone to the jury when it began deliberations.  At the *Machner* hearing, trial counsel testified that he "did not … believe that the autopsy should have gone to the jury" because the autopsy's conclusion was "clear" and there was testimony discussing the autopsy report at trial; thus there was no need for the jury to have the physical report. Counsel also stated that there were "other things in the autopsy that were not testified to," making it inappropriate to submit to the jury during deliberations. Counsel employed a strategic decision in deciding not to send the report, which contained extraneous information, to the jury.  Counsel's decision was reasonable under the circumstances.  *See Balliette*, 336 Wis. 2d 358, ¶26.

*Failure to Argue Other Potential Causes of Death*

¶20     Stynes argues that trial counsel should have argued that the cause of Cameron's death might have been viral pneumonia.  The argument is based on a comment in an email from the defense expert to trial counsel, which requested tissue slides in order to rule out that possibility.  Counsel testified that the defense expert tested the slides and determined that pneumonia was not a viable defense. Trial counsel explained that there was no medical basis for him to argue other potential causes of death.  We agree with the postconviction court that "possibilities" are not admissible evidence and that counsel employed a reasonable strategy by refusing to pursue a defense based on a theory that was negated by a medical expert.  *See State v. Allen*, 2017 WI 7, ¶46, 373 Wis. 2d 98, 890 N.W.2d 245 ("[F]ailing to make meritless arguments" cannot be the basis for a claim of ineffective assistance of counsel.).

*Failure to Enter the X-ray of Cameron's Head Taken Prior to the Autopsy*

¶21     Stynes argues that pre-autopsy cranial x-rays showing no visible skull fracture should have been submitted to the jury. Stynes contends that trial counsel should have "enter[ed] into evidence as many pieces of evidence [as] possible that show no fracture existed to begin with until it showed up in the autopsy." At the *Machner* hearing, counsel stated that the defense expert clearly testified at trial that the x-rays did not show a skull fracture. The State did not dispute the x-ray findings; instead, the State's expert opined that the angle of the x-ray was the reason a visible fracture did not appear. Because the x-ray was fully testified to, counsel did not see a need to submit the x-rays into evidence. Counsel's decision was strategic and reasonable, therefore we conclude that counsel did not render deficient performance as to this claim. *See Balliette*, 336 Wis. 2d 358, ¶26.

*Failure to Preemptively Raise Negative and Controversial Media Coverage Regarding the Defense Expert's Previous Employment and Discharge*

¶22     Next, Stynes contends that counsel should have taken "preemptive action" to ask the defense expert about "the circumstances concerning his termination and put them in a light most favorable" to his credibility, rather than "not address[ing] it at all." At the *Machner* hearing, counsel stated that the State's attempt to impeach the defense expert did not actually undermine the expert's credibility. Counsel noted that the defense expert was likely fired for "not sid[ing] with the State in the prosecution of the Martin case."

¶23     That trial counsel could have preemptively elicited testimony about the defense expert's termination from a Florida medical examiner's office does not automatically render counsel's decision not to do so deficient. The defense expert

testified in numerous trials, was aware that his employment history could be raised at trial, and explained that he believed his termination was a result of not siding with the party that hired him. It was not unreasonable for counsel to assume that the expert's credibility remained intact. Accordingly, Stynes has not overcome the strong presumption that counsel acted properly within professional norms. *See* *Strickland*, 466 U.S. at 689-91.

*Failure to Interview the Autopsy Assistant*

¶24 Stynes argues that trial counsel failed attempt to speak to the autopsy assistant who "actually made the saw cut into the skull" that the defense expert blamed for the skull fracture. At the *Machner* hearing, counsel testified that he made a deliberate decision not to interview the assistant. Counsel stated that if he had interviewed the assistant, the assistant would have simply stated that she did not cause the fracture, and the State would have called the witness to the stand to attest to the same. Rather, counsel found it strategically preferable to argue to the jury that the witness had not been called by the State "to refute what [the defense] had alleged." Counsel's decision was reasonably based on fact and law and thus does not constitute ineffective assistance. *See State v. Hubanks*, 173 Wis. 2d 1, 28, 496 N.W.2d 96 (Ct. App. 1992).

*Failure to Prepare Stynes for Sentencing*

¶25 Finally, Stynes contends that trial counsel failed to prepare him for sentencing. Specifically, Stynes contends that:

> [n]o one explained to Mr. Stynes what a presentence investigation was or to expect a visit from a person from the probation department to interview him for sentencing purposes. No one counseled Mr. Stynes about the fact that the Court needed to know more about his background, as

11

the Court clearly indicated on the record during the sentencing.

[Trial counsel] never made any recommendation to the Court for a fair and proper sentence. In fact, [trial counsel] said only two paragraphs in the transcript that was very uninformative.

Under these circumstances, looking at the charge and correctional time Mr. Stynes was facing, his lack of remorse due to his denial of doing what was alleged and an overall consideration of the trial, it is difficult to believe [trial counsel] wouldn't have had his own defense presentence report or at a minimum a sentencing memorandum.

(Record citation omitted.)

¶26 Stynes's allegations are belied by trial counsel's testimony at the *Machner* hearing. Counsel testified that he met with Stynes multiple times pre-trial and that following the jury verdict, counsel met with Stynes and informed Stynes that a presentence writer would also be meeting with him. Counsel stated that he advised Stynes not to discuss the facts of the case with the writer, but that Stynes chose not to answer other questions pertaining to his education and employment because he was "angry." Counsel also testified that he met with Stynes following the completion of the report. Counsel further stated that he informed the sentencing court of all of the factors he thought were relevant to the court's decision, including Stynes's lack of a criminal record, his employment history, his lack of a motive, and the fact that he had other children. The postconviction court found counsel credible and determined that counsel was not deficient as to sentencing.

¶27 We affirm the postconviction court's credibility determinations regarding ineffective assistance of counsel issues unless the determinations are clearly erroneous, *see State v. Domke*, 2011 WI 95, ¶58, 337 Wis. 2d 268, 805

N.W.2d 364. There is no basis in the record for us to overturn the postconviction court's credibility determination. Accordingly, we conclude that counsel did not render deficient performance as to sentencing.

*Cumulative Prejudice*

¶28 Stynes acknowledges that each individual alleged deficiency is "[p]robably" insufficient to support a claim of ineffective assistance of counsel; rather, Stynes contends that the cumulative effect of the alleged deficiencies taken together prejudiced his case. To find cumulative prejudice, we must find that the effect of multiple deficiencies prejudiced the defendant and undermined confidence in the outcome of the trial. *Thiel*, 264 Wis. 2d 571, ¶58. Because none of the alleged deficiencies fall below an objective standard for reasonableness, there is no cumulative prejudice. *See id.*, ¶59 (court must calculate cumulative effect by taking together individual deficiencies).

¶29 Taking together trial counsel's explanations at the *Machner* hearing, the evidence introduced at trial, and the postconviction court's rulings, we conclude that trial counsel did not provide ineffective assistance of counsel. Accordingly, we affirm the judgment of conviction and the order denying Stynes's postconviction motion.[3]

---

[3] To the extent Stynes raises issues not addressed by this decision, we conclude that our resolution of the issues addressed is dispositive and that the record supports the trial court and the postconviction court.

13

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2019-20).