COURT OF APPEALS
DECISION
DATED AND FILED

April 16, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1921-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2020CF150

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

ARTURO SANDOVAL-CERON,

    DEFENDANT-APPELLANT.

 

APPEAL from a judgment and an order of the circuit court for Waushara County: GUY D. DUTCHER, Judge. *Affirmed*.

Before Graham, P.J., Blanchard, and Kloppenburg, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Arturo Sandoval-Ceron appeals a judgment of conviction entered after a jury found him guilty of first-degree sexual assault of a child under the age of 13 and an order denying his postconviction motion to vacate the judgment. Sandoval-Ceron, whose native language is Spanish, argues that he is entitled to a new trial because his trial counsel provided constitutionally ineffective assistance before and at trial. He argues that, at a pretrial hearing on his motion to suppress statements that he made during an interview with a correctional investigator, counsel was ineffective in failing to: (1) call as a witness the correctional officer who acted as an interpreter during the interview by the investigator, in order to show that the interpretation was inaccurate; and (2) argue that the investigator's use of the "Reid technique" made the interview custodial, thereby requiring **Miranda** warnings, which were not provided at the interview.[1] Sandoval-Ceron also argues that, at trial, counsel was ineffective in failing to: (1) have the interpreting correctional officer, whom the State called as a witness, demonstrate his ability to translate between Spanish and English; and (2) object to hearsay testimony by the victim's mother. In the alternative, Sandoval-Ceron argues that he is entitled to a second hearing on his ineffective assistance of counsel claim.

¶2 We reject Sandoval-Ceron's arguments and affirm.

---

[1] The "Reid technique" refers to custodial interrogation tactics described in *Criminal Interrogation and Confessions*, Fred E. Inbau & John E. Reid (Williams & Wilkins Co. 1962). *See **Miranda v. Arizona***, 384 U.S. 436, 448-57, 449 n.9, 450 nn.12-13 (1966) (discussing interrogation strategies by which a person in custody is "thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures" designed to "subjugate the individual to the will of [the person's] examiner").

## BACKGROUND

¶3    In September 2020, the State charged Sandoval-Ceron with first-degree sexual assault of a child under the age of 13.  The criminal complaint alleged as follows.  Detective Sergeant Jason Christenson of the Waushara County Sheriff's Office reviewed a video of a forensic interview of A.B., who resides in Texas.[2]  In that interview, A.B. said that, during a trip to Wisconsin with his brother "when he was younger," he was sexually assaulted by his brother's father when staying at his brother's father's house.  Christenson then spoke with A.B.'s mother, who identified Sandoval-Ceron as the father of A.B.'s brother.  A.B.'s mother said that A.B. and his brother stayed with Sandoval-Ceron in Coloma, Wisconsin, for approximately three weeks in July 2011 or 2012.

¶4    The complaint further alleged as follows.  When Christenson began investigating A.B.'s allegations, Sandoval-Ceron was incarcerated in Michigan on unrelated charges.   At Christenson's request, Michigan State Correctional Investigator Chad Williams interviewed Sandoval-Ceron in the correctional facility in which he was incarcerated.  Michigan State Correctional Officer Rolando Cantu acted as an interpreter during the interview.  In response to Williams' questions, Sandoval-Ceron confirmed that he knew A.B. and A.B.'s mother and that he was the father of A.B.'s brother.  Sandoval-Ceron also confirmed that he had lived in Coloma, and that A.B. and A.B.'s brother had visited him in the summer of either 2011 or 2012.

---

[2] Consistent with the policy stated in WIS. STAT. RULE 809.86(4), we refer to the victim using initials that do not correspond to his actual name.

All references to the Wisconsin Statutes are to the 2023-24 version.

3

¶5 After the State filed the criminal complaint, Sandoval-Ceron filed a pre-trial motion to suppress his statements during the interview on the grounds that he was not informed of his *Miranda* rights before making any statements and that his statements were involuntary. The circuit court addressed Sandoval-Ceron's motion to suppress at the final pre-trial hearing in March 2021, which we will refer to as "the suppression hearing." After hearing testimony from Williams and Sandoval-Ceron, in part relating to Cantu's interpretation during the interview, the court denied the motion. The court concluded that the State established that Sandoval-Ceron was not in custody for purposes of *Miranda* and that his statements were voluntary. The case proceeded to a two-day jury trial that resulted in a guilty verdict. We now summarize portions of the testimony at the trial.

¶6 Investigator Williams testified as follows. During the interview at the correctional facility, Sandoval-Ceron said that A.B.'s mother had sent A.B. to Wisconsin sometime around 2011 or 2012 with Sandoval-Ceron's son (A.B.'s brother) and A.B.'s uncle. Sandoval-Ceron said that a female babysitter would watch the children while Sandoval-Ceron was at work. When Williams told Sandoval-Ceron that A.B. alleged that Sandoval-Ceron had touched him inappropriately, Sandoval-Ceron said that he helped A.B. get bathed and dressed after bath time but did not specifically recall touching A.B. inappropriately.

¶7 Williams further testified that, when he asked Sandoval-Ceron "what should happen to somebody who touches a child inappropriately," Sandoval-Ceron responded that he "didn't know exactly what should happen. He didn't want to be judgmental, but he believes a proper investigation should take place." Williams told Sandoval-Ceron that "there are multiple reasons why somebody might touch a minor child," and suggested several reasons, including an inadvertent touching

while bathing. Williams asked Sandoval-Ceron which of the "reasons" applied to his conduct, and Sandoval-Ceron said that he may have inadvertently touched A.B.'s genitals while he was bathing A.B. and getting him dressed and dried off after a bath.

¶8     A.B. testified as follows. During the summer of 2011 or 2012, he was living in Dallas, Texas, and took a bus with his brother and uncle to stay with a relative. He did not at that time know how the relative was related to him. A.B. and his brother and uncle stayed at the relative's house in Wisconsin in the fall for "a couple of months[,] [m]aybe four." A female babysitter sometimes stayed with the children. The relative sexually assaulted A.B. during the visit, which A.B. described in detail. A.B. could not describe what the relative looked like, but A.B. would be able to recognize him. A.B. identified Sandoval-Ceron in court as that relative, based on his "stature, and the look, and his skin color too." A.B. did not need Sandoval-Ceron to remove the mask that Sandoval-Ceron was wearing in the courtroom due to the COVID pandemic; even with the mask on, A.B. could tell that Sandoval-Ceron was the relative who had sexually assaulted him.

¶9     A.B. further testified that, in the fall of 2019, he told his mother that he had been sexually assaulted. When A.B. subsequently spoke to the forensic interviewer about the sexual assault, the interviewer asked him who the relative was, and A.B. told the interviewer that his mother explained to him who the relative probably was. A.B. also described to the interviewer the relative's facial hair and hair color, but he did not describe the relative's skin tone, even though he knew it. When asked why he did not provide that detail to the forensic interviewer, A.B. testified that "back then, [he] was just so nervous … to the point where [he] couldn't remember certain things like what [the relative] looked like and stuff."

¶10   The forensic interviewer testified that when the interviewer asked A.B. who had sexually assaulted him, A.B. said, "I'm not sure. I honestly don't remember. I don't remember. My mom told me, but I don't remember." A.B. also said, "He's my brother's dad. I think so. I'm not sure. I don't remember. She told me, and I don't remember that." The interviewer asked more than once how A.B. knew that it was his brother's dad, and each time he said it was because his mother told him. A.B. also told the interviewer that he had not seen the relative before or since the trip.

¶11   A.B.'s uncle testified as follows. He is approximately five years older than A.B. He knows that Sandoval-Ceron is the father of A.B.'s brother. During the summer of 2011, when the uncle was ten years old, the uncle took a trip to Sandoval-Ceron's house in Coloma with A.B. and A.B.'s brother. On that trip, the three children took a 16-to-19-hour bus ride and were picked up by Sandoval-Ceron at a bus station and taken to his house in Coloma. The uncle identified Sandoval-Ceron's house as the house depicted in a photograph exhibit. A babysitter stayed with the children when Sandoval-Ceron was working. The three children stayed at Sandoval-Ceron's house for one week.

¶12   Officer Cantu testified as follows. Cantu was born in South Texas, and Spanish is his first language. He has spoken Spanish since he could first speak, and he characterized himself as fluent in Spanish. He speaks what he described as "Tex-Mex Spanish" and is not licensed to interpret. In June 2020, he was asked to assist Williams by interpreting during an interview of Sandoval-Ceron. Williams asked his questions in English, and Cantu repeated the questions in Spanish. Sandoval-Ceron answered in Spanish, and Cantu repeated the answers to Williams in English. Cantu asked Sandoval-Ceron several times if he

understood what Cantu was saying, "and he said he did." Cantu accurately interpreted both the questions and answers.

¶13 A.B.'s mother testified as follows. Sandoval-Ceron is the father of one of her children. In July 2011, when A.B. was six years old, A.B. and his uncle and his brother (Sandoval-Ceron's son) went to visit Sandoval-Ceron at Sandoval-Ceron's house in Coloma. The three children took a bus with A.B.'s great-grandmother to Chicago, where Sandoval-Ceron picked the children up. A babysitter stayed with the children when Sandoval-Ceron was at work.

¶14 A.B.'s mother further testified that, in 2019, A.B. "started skipping school, and he started failing class…. He didn't have friends. He just was like he didn't want anything to do with life." A.B.'s mother asked A.B. what was going on. A.B. "started crying. He started getting nervous…. And the first thing that he asked [his mother] was, 'Who was the man that you sent us to in Wisconsin?'" A.B.'s mother reported what A.B. told her about what happened in Wisconsin to A.B.'s school and later to the police. She told the police that the trip to Coloma occurred in July 2011 or 2012.

¶15 Detective Christenson testified as follows. In December 2019, he was contacted by the City of Dallas Police Department regarding a report of a sexual assault in Coloma. Christenson reviewed the report and a video recording of the forensic interview with A.B., and then spoke to A.B.'s mother. A.B.'s mother said that Sandoval-Ceron had been living in Coloma at the time of the trip, which she was "fairly certain" took place in July of 2011 or 2012. Christenson confirmed through the department's records system that Sandoval-Ceron had previously lived at an address in Coloma, and Christenson identified Sandoval-Ceron's house as the same house that A.B.'s uncle earlier identified in the

photograph exhibit. The report that Christenson received from the Dallas Police Department showed that Sandoval-Ceron lived in Coloma in 2009, and in Wautoma, Wisconsin, in 2010, 2011, and 2012.

¶16 The owner of the house in Coloma that was depicted in the photograph referenced above testified that Sandoval-Ceron lived at that house beginning in 2008 or 2009, with someone the owner believed to be Sandoval-Ceron's brother. The term of the lease may have extended through the summer of 2010, but neither Sandoval-Ceron nor his brother lived there in 2011 or 2012, because the owner was remodeling the building.

¶17 In the State's closing argument to the jury, the prosecutor twice noted that, when initially disclosing the sexual assault to his mother, A.B. asked his mother who the person he visited in Wisconsin was. The prosecutor further referenced Sandoval-Ceron's statements to Investigator Williams that the children had visited Sandoval-Ceron in 2011 or 2012 and that Sandoval-Ceron had helped A.B. get bathed and dressed. The prosecutor told the jury that Sandoval-Ceron did "provide details … that corroborate[] at least part of what [A.B. and his mother] and [A.B.'s uncle] were saying." The prosecutor acknowledged that there were some disparities in the timelines in the various witnesses' testimony, but reiterated that Sandoval-Ceron himself "brought up that time … between 2011 and 2012."

¶18 In Sandoval-Ceron's closing argument, defense counsel highlighted disparities in the testimony as to numerous aspects of the trip, including the length of the trip, the year and the season in which it occurred, what town Sandoval-Ceron was living in at the time of the trip, whether A.B.'s great-grandmother went on the bus to Chicago with the three children, and whether A.B. had seen Sandoval-Ceron either before or since the trip. Counsel also pointed out

inconsistencies between A.B.'s mother's trial testimony and the statements she gave to police. Counsel emphasized the testimony that A.B. told the interviewer that "he never knew who did this to him. His mother had told him." Counsel told the jury that "[a]part from [A.B.'s mother's] contamination of [A.B.'s] recollection, [A.B.] had no independent way to identify his assaulter. That's never a process that he was able to go through." Counsel also referenced Sandoval-Ceron's statements to Investigator Williams, emphasizing that Sandoval-Ceron denied sexually assaulting A.B. and that he encouraged an investigation of the allegations.

¶19 In rebuttal argument, the prosecutor sought to downplay the timeline discrepancies by pointing out that Sandoval-Ceron himself told Williams that the children visited him in 2011 or 2012. The prosecutor also argued that A.B.'s statements that he did not know who sexually assaulted him referred to not knowing Sandoval-Ceron's name or the nature of Sandoval-Ceron's relation to A.B., as opposed to not being able to identify Sandoval-Ceron as the person who sexually assaulted him.

¶20 The jury found Sandoval-Ceron guilty of first-degree sexual assault of a child under age 13.

¶21 Sandoval-Ceron filed a motion for postconviction relief seeking a new trial based, in pertinent part, on the alleged ineffective assistance of counsel. Sandoval-Ceron alleged, among other things, that his trial counsel was ineffective at the suppression hearing for failing to: call Officer Cantu to testify; and argue that Investigator Williams' use of the Reid technique during the interview of Sandoval-Ceron rendered the interview custodial. Sandoval-Ceron also alleged that his trial counsel was ineffective at trial for failing to: cross-examine Cantu to

test the accuracy of his interpretation; and object on hearsay grounds to A.B.'s mother's testimony regarding A.B. asking her who was the man she sent him to visit in Wisconsin.

¶22    The circuit court held a *Machner* hearing at which Sandoval-Ceron's trial counsel, Officer Cantu, and a defense expert witness testified.[3]  In its oral ruling, the court concluded that the admission of Sandoval-Ceron's statements did not prejudice him, and therefore that his trial counsel was not ineffective for failing to make additional arguments to suppress those statements.  The court found that Sandoval-Ceron "is not credible" in his testimony about miscommunication during the interview and that there is no evidence that Officer Cantu interpreted anything inaccurately.  Regarding the admission of A.B.'s mother's testimony that A.B. asked her, "Who was the man that you sent us to in Wisconsin?" the court stated that the testimony was "objectionable" and "likely hearsay."  However, the court concluded that Sandoval-Ceron was not prejudiced by the admission of the testimony.

¶23    The circuit court entered an order denying the postconviction motion, and Sandoval-Ceron appeals.[4]

---

[3] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[4] Given the considerable passage of time, we note key parts of the procedural timeline since Sandoval-Ceron's conviction in April 2021.  Counsel appealed the judgment of conviction in June 2022, after receiving multiple extensions to file a notice of appeal.  Counsel then moved to dismiss the appeal in November 2022 to pursue postconviction relief and, after receiving additional extensions, filed the postconviction motion at issue here in June 2024.  The circuit court held the *Machner* hearing on the motion in August 2024 and entered the order denying the motion in September 2024.  Sandoval-Ceron timely filed a notice of appeal in September 2024.

# DISCUSSION

¶24 On appeal, Sandoval-Ceron argues that he is entitled to a new trial because his trial counsel provided constitutionally ineffective assistance in two respects at the suppression hearing and in two respects at trial. Sandoval-Ceron argues in the alternative that he is entitled to a second hearing on his ineffective assistance of counsel claim at which he should be allowed to create "a complete reconstruction of the [interview] through Cantu."

## I. Legal Principles and Standard of Review

¶25 The United States Constitution guarantees to criminal defendants the right to the effective assistance of counsel. *State v. Domke*, 2011 WI 95, ¶34, 337 Wis. 2d 268, 805 N.W.2d 364; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To demonstrate that counsel's assistance was ineffective, the defendant must establish both "that counsel's performance was deficient and that the deficient performance was prejudicial." *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. "[T]here is no reason for a court deciding an ineffective assistance claim … to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. The defendant bears the burden of showing both of these prongs. *Id.* at 687-88.

¶26 We resolve Sandoval-Ceron's ineffective assistance of counsel claim based on his failure to meet his burden to show prejudice. Counsel's asserted deficient performance prejudiced the defense if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. To prove prejudice, a defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to

11

undermine confidence in the outcome." *Id.* at 694. In other words, when challenging a conviction resulting from a jury verdict, a defendant must establish that, but for trial counsel's errors, "there is a reasonable probability that … the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. A defendant need not prove that the outcome "more likely than not" would have been different absent trial counsel's errors. *Id.* at 693. While one error alone may not have prejudiced the defense, the cumulative effect of multiple errors may undermine a reviewing court's confidence in the outcome of the proceeding, "depend[ing] upon the totality of the circumstances at trial." *State v. Thiel*, 2003 WI 111, ¶¶60-62, 264 Wis. 2d 571, 665 N.W.2d 305.

¶27 Whether a defendant received ineffective assistance of counsel is a mixed question of fact and law. *Domke*, 337 Wis. 2d 268, ¶33. The circuit court's findings of fact, "'including the circumstances of the case and … counsel's conduct and strategy,'" will not be disturbed unless those findings are clearly erroneous. *Id.* (quoted source and alteration omitted). Whether those facts constitute deficient performance and whether such deficient performance was prejudicial are questions of law that we review independently. *Id.*

## II. Analysis

### A. Errors at Pretrial Suppression Hearing

¶28 Sandoval-Ceron argues that his trial counsel was deficient at the suppression hearing for failing to call as a witness Officer Cantu, who acted as an interpreter during the interview by Investigator Williams, and for failing to argue that Williams' use of the Reid technique rendered the interview custodial. Sandoval-Ceron argues that these two asserted errors prejudiced him because: had counsel called Cantu to testify, the circuit court would have found that Cantu's

interpretation was unreliable and suppressed Sandoval-Ceron's interpreted statements as involuntary or excluded Cantu's and Williams' testimony as inadmissible unqualified expert testimony and hearsay, respectively; and had counsel argued about Williams' use of the Reid technique, the court would have found that Sandoval-Ceron was in custody and suppressed his statements as obtained in violation of *Miranda*. Sandoval-Ceron further argues that, had his statements at the interview been suppressed, the jury would not have found him guilty.

¶29 The introduction of Sandoval-Ceron's statements through Williams' testimony at trial provided the following information to the jury. Sandoval-Ceron told Williams that A.B., A.B.'s brother, and A.B.'s uncle were sent to stay with him in Wisconsin sometime in 2011 or 2012. When initially confronted about A.B.'s allegations of sexual assault, Sandoval-Ceron told Williams that a babysitter had watched the children when he was at work. When Williams asked Sandoval-Ceron "what should happen to somebody who touches a child inappropriately," Sandoval-Ceron said that he did not know, and that an investigation should take place. He also did not know how the investigation of A.B.'s allegations would turn out because it was his word against A.B.'s. After Williams told Sandoval-Ceron that he believed Sandoval-Ceron had touched A.B. inappropriately and suggested that one of the reasons someone might do such a thing is because the person inadvertently touches the child's genitals when bathing the child, Sandoval-Ceron said that he might have accidentally touched A.B.'s genitals when drying him off after a bath. Sandoval-Ceron denied intentionally touching A.B. inappropriately.

¶30 Sandoval-Ceron's statements did not appreciably assist the prosecution. The fact that the three children visited and stayed with Sandoval-

Ceron in Wisconsin in 2011 or 2012 was established through the testimony of A.B., A.B.'s mother, and A.B.'s uncle. And, in none of Sandoval-Ceron's purported statements relayed to the jury did he admit to touching A.B. during that visit in the ways that A.B. alleged. Accordingly, even if the statements would have been suppressed had counsel either called Officer Cantu or argued about Investigator Williams' use of the Reid technique, there is not "a reasonable probability that, but for counsel's [failure to do so], the result of the proceeding would have been different." *See* **Strickland**, 466 U.S. at 694. For this reason, Sandoval-Ceron fails to show that any errors in failing to seek suppression of the statements, based either on Cantu's interpretation or Williams' use of the Reid technique, prejudiced Sandoval-Ceron.

¶31 Sandoval-Ceron argues that the jury would not have convicted him without the admission of his statements. He asserts that the centrality of his statements to the State's case is evident from the fact that the State called Williams as its first witness, and that Williams "recount[ed] the entire interrogation line-by-line, including statements that cast … Sandoval-Ceron as evasive." Sandoval-Ceron specifically asserts that the statements that he "*may* have touched" A.B.'s genitals when drying him off after a bath and that he was uncertain "about what should happen to a child molester" were framed by the State "as a partial admission of guilt." However, Sandoval-Ceron overstates the significance of his statements as well as of the prosecutor's closing remarks about those statements. That Sandoval-Ceron "may have touched" A.B.'s genitals in connection with assisting him with bathing is not an admission of criminal conduct; it is in the nature of a defense. And, the prosecutor did not argue to the contrary. The prosecutor in closing acknowledged that Sandoval-Ceron "doesn't admit that he inappropriately touched [A.B.]" The prosecutor relied on Williams' testimony

about what Sandoval-Ceron told him to the extent that it "corroborate[d] at least part of what" other witnesses said—specifically, that the children visited him in Wisconsin in 2011 or 2012.

¶32 Sandoval-Ceron argues that, without his corroboration that the children visited him in Wisconsin in 2011 or 2012, "the evidence that a trip to Coloma happened around 2011 was weak." He points to the inconsistencies in testimony by A.B., A.B.'s mother, and A.B.'s uncle regarding the length of the trip, whether the great-grandmother traveled with the children, and whether Sandoval-Ceron lived in Coloma in 2011 or 2012. He argues that these inconsistencies made those other witnesses' ability to recall the trip "questionable." However, despite the lack of agreement on certain details by A.B. and A.B.'s uncle, who were between six and ten years old when the trip occurred nearly ten years before trial, and by A.B.'s mother, all three witnesses agreed that a trip occurred, that the three children took a bus to a station where Sandoval-Ceron picked them up and took them to his house in Wisconsin, and that a babysitter stayed with the children for part of the trip. Admitting Sandoval-Ceron's statements that merely corroborated this information did not undermine the reliability of the trial. *See **Thiel***, 264 Wis. 2d 571, ¶62 (the focus of the prejudice analysis is on "the overall reliability of the trial").

*B. Errors at Trial*

1. Cantu's Testimony

¶33 Sandoval-Ceron argues that trial counsel was ineffective for not asking Officer Cantu to testify in Spanish at trial, which he submits would have "expose[d] [Cantu's] inadequate interpretation skills," and thereby prompted the jury to question the reliability of Sandoval-Ceron's statements.

15

¶34    At the *Machner* hearing, Cantu testified and was asked to translate into Spanish three English sentences that Investigator Williams had testified Williams said to Sandoval-Ceron during the interview.   The certified court interpreter at the hearing was not able to interpret Cantu's translation of two of the sentences because "some of the words were English, some of the words were Spanish, and there were words in there that were not words in English or Spanish." The interpreter interpreted Cantu's translation of the third English sentence— "Sometimes children are curious about sexual education and ask a lot of questions regarding their private parts."—as, "Sometimes children have questions about their parts."

¶35    As we have explained, Sandoval-Ceron's statements introduced at trial through Williams did not appreciably assist the prosecution, and included details about the children's trip to visit him that were corroborated by other testimony.   Nor did the State, as Sandoval-Ceron now argues, tell the jury that Sandoval-Ceron's statements "amount[] to a partial admission of guilt." Accordingly, had the jury been presented with Cantu's deficiencies in translating those statements and disregarded the statements as unreliably interpreted, there is not a reasonable probability that the outcome of the trial would have been different.   For this reason, we conclude that Sandoval-Ceron fails to show that he was prejudiced by counsel's failure to elicit Spanish testimony by Cantu at trial.

### 2.  A.B.'s Mother's Hearsay Testimony

¶36    Sandoval-Ceron argues that his trial counsel was ineffective for failing to object to A.B.'s mother's testimony that A.B. had asked her, "Who was the man that you sent us to in Wisconsin?" on the ground that the testimony was hearsay.   Sandoval-Ceron argues that this testimony "was the linchpin of the

conviction" because it "allowed the State to claim, twice, that [A.B.] disclosed [that] the abuse occurred during the Wisconsin trip."

¶37 We briefly recap pertinent portions of the trial regarding this and related testimony. In the State's opening statement, the prosecutor told the jury that the evidence would show that, when A.B. talked to his mother about the sexual assault, A.B. "brings up the relative that took him to Wisconsin, and he doesn't really know exactly who the defendant is." In Sandoval-Ceron's opening statement, defense counsel told the jury that A.B. "was never able to identify the individual that did this to him," and that, instead, A.B.'s mother told him who sexually assaulted him.

¶38 During the State's case-in-chief, the prosecutor asked A.B. whether he "recall[ed] asking [his] mom who the person was that had taken [him] to Wisconsin," and A.B. testified that he did not recall that. Later, A.B.'s mother testified that when she asked A.B. to tell her what was going on, "the first thing that he asked [her] was, 'Who was the man that you sent us to in Wisconsin?'"

¶39 In the State's closing argument, the prosecutor told the jury that there was no dispute that Sandoval-Ceron "is the person that we are dealing with" and "the one" who assaulted A.B. The prosecutor noted the testimony by multiple witnesses that Sandoval-Ceron was the person whom the three children visited, and highlighted A.B.'s identification in court of Sandoval-Ceron as the man who assaulted him. In Sandoval-Ceron's closing argument, defense counsel told the jury that, during the forensic interview, A.B. "clearly states repeatedly that he never knew who did this to him. His mother had told him." Counsel attempted to discount A.B.'s mother's testimony by stating that "[A.B.] said he never said that. His mother told him. Apart from [A.B.'s mother's] contamination of [his]

17

recollection, [A.B.] had no independent way to identify his assaulter." In rebuttal argument, the prosecutor told the jury that A.B.'s statements that he did not know who sexually assaulted him referred to A.B. not knowing Sandoval-Ceron's name or exact relation to him.

¶40    We conclude that Sandoval-Ceron fails to show that trial counsel's failure to object to A.B.'s mother's testimony as hearsay prejudiced him. A.B. himself stated in the forensic interview and in his trial testimony that the relative whom the three children visited in Wisconsin assaulted him, and A.B. identified in court Sandoval-Ceron as that relative based on his memory of how the relative looked. Given the strength of A.B.'s own statements and testimony, Sandoval-Ceron does not convince us that the exclusion of A.B.'s mother's testimony would have resulted in a "reasonable probability" that the jury "would have had a reasonable doubt respecting guilt." *See Strickland*, 466 U.S. at 695.

¶41    Sandoval-Ceron argues that A.B.'s mother's testimony "improperly bolstered one of the State's weakest points: The extent of [A.B.'s] independent memory of who the perpetrator was." He further argues that A.B.'s in-court identification of Sandoval-Ceron was "only compelling" because of "the mother's hearsay statement that [A.B.] independently recalled his assailant was 'that man you sent us to in Wisconsin.'" For the reasons explained above, we conclude that A.B.'s own statements and testimony were sufficiently clear, and corroborated, that there is not a reasonable probability that the outcome would have been different had A.B.'s mother's testimony been excluded.

### C. Cumulative Prejudice

¶42    For the same reasons that there is no prejudice from each individual asserted error in this case, we conclude that there is no cumulative prejudice from

the asserted errors taken together. *See **Thiel***, 264 Wis. 2d 571, ¶¶60-62 (reviewing courts should consider the cumulative effect of trial counsel's errors when determining prejudice). Sandoval-Ceron does not show that, had his statements been excluded or their reliability called into question, and had A.B.'s mother's hearsay testimony been excluded, there is a reasonable probability that the jury would have acquitted him. To repeat, Sandoval-Ceron's statements were not of significant value to the prosecution and the salient details were corroborated by other testimony, A.B. himself testified that he was assaulted by the relative whom the three children visited in Wisconsin, and A.B. identified Sandoval-Ceron as that man in court. In other words, because of the strength of the State's case when the results of the allegedly deficient performance are taken out of the picture, Sandoval-Ceron does not show that he was prejudiced.

### III. Remand for Second Hearing

¶43 In the alternative, Sandoval-Ceron argues that he is entitled to a second evidentiary hearing at which he should be allowed to "fully question Cantu." He argues that we should remand "for a complete reconstruction of the interrogation through Cantu," with a certified court interpreter interpreting. We reject this argument because it is undeveloped.

¶44 To repeat, at the *Machner* hearing, the circuit court allowed postconviction counsel to ask Officer Cantu to interpret from English to Spanish only three sentences that Investigator Williams testified he said to Sandoval-Ceron during the interview, with results that we summarize above.

¶45 Sandoval-Ceron does not develop an argument supported by relevant legal authority that he is entitled to a second *Machner* hearing, at which Cantu would be asked to interpret all of Williams' interview, in light of our explanation

above about how he fails to show prejudice that could support a claim of ineffective assistance of counsel. We reject it on that basis. *See **State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (explaining that this court need not consider arguments that are undeveloped and unsupported by legal authority).[5]

## CONCLUSION

¶46    For the reasons stated, we affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[5] To the extent that Sandoval-Ceron also means to argue that the circuit court erroneously exercised its discretion by limiting him to asking Cantu to interpret only three sentences that Williams testified he said to Sandoval-Ceron during the interview, the record refutes such an argument.